937 F.2d 609
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Randy EDMUNDSON, Defendant-Appellant.
 No. 89-1475.
 United States Court of Appeals, Sixth Circuit.
 July 23, 1991.
 
 Before DAVID A. NELSON, Circuit Judge, KRUPANSKY, Senior Circuit Judge,* and BELL, District Judge.**
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 The Child Protection Act of 1984 makes it a criminal offense knowingly to receive child pornography through the mail. See 18 U.S.C. Sec. 2252(a)(2). Defendant Randy Edmundson, an admitted pedophile who had served several years in a state prison for criminal sexual conduct with young members of his family, was convicted on one count of an indictment charging him with a violation of the Child Protection Act and a second count charging him with violating federal law relating to the possession of firearms by convicted felons. See 18 U.S.C. Secs. 922(g)(1) and 924(a)(1)(B).
 
 
 2
 Defendant Edmundson appeals on three grounds: (1) that an "anticipatory" search warrant pursuant to which the contraband was discovered in his residence was issued and executed in violation of his rights under the Fourth Amendment; (2) that the search of his residence exceeded the scope of the warrant; and (3) that he was the target of a "sting" operation so outrageous in character that it violated his right to due process under the Fifth Amendment. Finding none of these contentions persuasive, we shall affirm the convictions.
 
 
 3
 * The search warrant in question was issued by a United States magistrate on the strength of an affidavit executed by a postal inspector named Michael O'Hara. Inspector O'Hara's affidavit stated, among other things, that five years earlier Mr. Edmundson had been convicted on criminal sexual conduct charges arising out of sexual relationships with several young nieces; that police reports indicated that the sexual misconduct had begun when the nieces were five years old or younger; and that at the time of his arrest by the Michigan authorities, photographs depicting the minor nieces in nude and semi-nude poses had been found in a chicken coop next to Mr. Edmundson's house.
 
 
 4
 The inspector's affidavit went on to say that a photoprocessing firm had recently reported that Mr. Edmundson was bringing in rolls of film to be developed; that an employee of the firm said that Mr. Edmundson's pictures "are of some real weird things such as little girls underwear and ... close up shots of the girls butts and front side;" and that another employee said that Mr. Edmundson's films included "pictures of little kids between the ages of 5 and 13 with the look of utter terror on their faces."
 
 
 5
 Shortly after the date on which these reports started coming in from the photoprocessing firm, as Inspector O'Hara was to testify at trial, the inspector arranged to have an advertisement mailed to Mr. Edmundson from a purported mail order pornography business in American Samoa. The Samoan operation was actually a Postal Service front.
 
 
 6
 The text of the advertisement contained this language: "If you are interested in obtaining forbidden material send $2 for information to Samoan Adventures, Post Office Box 3371, Pago Pago, AS 96799." The affidavit stated that Mr. Edmundson had answered this solicitation; that he had subsequently expressed an interest in buying sexually-oriented materials involving pre-teen girls; and that Mr. Edmundson had recently sent in an order for Volume 4, Issue 5 of a magazine called "Lollitots," the cost of which was $29.95. The magazine was to be sent to a designated post office box rented by Mr. Edmundson some months earlier.
 
 
 7
 Inspector O'Hara's affidavit contained the following explanation of how the inspector intended to respond to the order placed by Mr. Edmundson;
 
 
 8
 "I intend to furnish the child pornography that EDMUNDSON has requested and sent payment for in the form of a controlled delivery, to be made to his Post Office Box, P.O. Box 13, at the New Hudson, Michigan Post Office. The parcel, containing the child pornography magazine will have travelled through the U.S. Mail. I intend to have a task force of Postal Inspectors, Novi Police Officers, and Oakland County Deputy Sheriffs assembled and ready to conduct surveillance on EDMUNDSON after delivery and ready to execute an anticipatory search warrant at his residence after he returns home. The search warrant will not be executed if he refuses delivery or if he does not return to his home."
 
 
 9
 The affidavit described in detail both the premises to be searched and the items to be seized there.
 
 
 10
 Based on this affidavit, United States Magistrate Marsha Cooke issued a warrant authorizing a search of Mr. Edmundson's residence within ten days. Inspector O'Hara's affidavit was incorporated in the warrant.
 
 
 11
 One day after the warrant's issuance, the Postal Service placed a card in Mr. Edmundson's post office box advising him of the arrival of a piece of mail that was too big for the box. Mr. Edmundson picked up the card soon thereafter, presented it to a window clerk, and was handed an oversized padded envelope bearing a Pago Pago return address and containing the magazine he had ordered. (This publication--which had pictures that the trial judge was to describe as "frightening"--had been confiscated by the Postal Service in a previous child pornography investigation.) After observing the delivery from inside the post office, Inspector O'Hara drove to Mr. Edmundson's house and waited for him to return.
 
 
 12
 Other law enforcement officials kept Mr. Edmundson under surveillance after he left the post office. He was seen to make two stops, one at a doctor's office and one at a restaurant, and he reached his house more than an hour later. Inspector O'Hara, who was parked down the street, saw Mr. Edmundson enter the house with the envelope.
 
 
 13
 After 15 or 20 minutes, Inspector O'Hara and another law enforcement officer knocked on Mr. Edmundson's front door. When Edmundson appeared, they told him that they had a federal search warrant and advised him of his Miranda rights. In the course of the ensuing search, two weapons--a .22 caliber Glenfield rifle and a .410 gauge Mossberg shotgun--were found behind a bedroom door. On the bed were the padded envelope and the issue of Lollitots. The inspector seized these items, and we are told that he also took diaries, family photographs, and church announcements.
 
 
 14
 A grand jury indicted Mr. Edmundson on two counts of sexual exploitation of children (the first of which counts was subsequently dropped) and one count of possession of firearms by a convicted felon. Edmundson filed several pre-trial motions, including a motion to suppress all of the evidence seized from his residence and a motion for separate trials on different counts of the indictment. After an evidentiary hearing before District Judge Richard Suhrheinrich, now a judge of this court, the motion to suppress was denied. Judge Suhrheinrich granted the severance motion, indicating a willingness to proceed with two separate juries. The defendant subsequently waived his right to trial by jury, however, and the case was tried to the court. Judge Suhrheinrich found the defendant guilty on both counts, and this appeal followed.
 
 II
 
 15
 Defendant Edmundson acknowledges that "anticipatory" search warrants are often issued in drug cases. (An anticipatory warrant is one issued on the strength of representations that the items being sought have not yet arrived at the premises to be searched, but are expected to be there by the time the search is conducted.) Edmundson contends that an anticipatory search warrant was improper here because of the absence of exigent circumstances of the type common in drug cases. The argument is that there was no risk that the pornography would be ingested, distributed or destroyed in the short time that would have been required to obtain a warrant after Mr. Edmundson had taken the offending magazine home.
 
 
 16
 Other courts have upheld the use of anticipatory warrants in child pornography cases despite the lack of exigent circumstances. See United States v. Dornhofer, 859 F.2d 1195 (4th Cir.1988), cert. denied, 490 U.S. 1005 (1989); U.S. v. Goodwin, 854 F.2d 33 (4th Cir.1988); United States v. Hale, 784 F.2d 1465 (9th Cir.), cert. denied, 479 U.S. 829 (1986). Dornhofer is perhaps most like the case before us. There too the government was conducting a sting operation. An anticipatory search warrant was issued for the defendant's home on the condition that the contraband would be placed in the mail addressed to the home. The court held that anticipatory warrants are permissible in child pornography cases "where the contraband to be seized 'is on a sure course to its destination.' " 859 F.2d at 1198, quoting Goodwin, 854 F.2d at 36. We see no reason here to depart from Dornhofer and decisions like it.
 
 
 17
 It is true that in the case at bar the controlled delivery was to be made not to Mr. Edmundson's home, but to the post office where he chose to receive his mail. It was hardly unreasonable to expect him to take his mail home from the post office, however, and it is significant that the warrant was not to be executed if Edmundson refused delivery or did not return to his home.
 
 
 18
 Mr. Edmundson complains that the warrant did not specify that he had to return directly home and did not require that he return home within any time period shorter than that for which the warrant was good. The warrant could thus have been executed even if he had dropped off the pornography at his doctor's office, taken a vacation, and returned home empty-handed days later.
 
 
 19
 We are not willing to invalidate the warrant on the basis of contingencies this remote. Few doctors are pedophiles, and unless National Geographic is to be put in a class with Lollitots, the magazines found in the waiting rooms of most doctors bear no resemblance to the latter publication. What the Fourth Amendment required was that a "substantial basis" be shown for concluding that a search of Edmundson's house would uncover evidence of wrongdoing, United States v. Pelham, 801 F.2d 875, 877-78 (6th Cir.1986), cert. denied, 479 U.S. 1092 (1987), and the adequacy of the showing must be determined on the basis of common sense. United States v. Seta, 669 F.2d 400, 402 (6th Cir.1982). Common sense suggests that after picking up his pornography at the post office, Mr. Edmundson was likely to do precisely what he did do--return home with it.
 
 
 20
 The record of this case contains nothing at all to support the claim that Magistrate Cooke failed to "manifest that neutrality and detachment demanded of a judicial officer," or that she served "merely as a rubber stamp" for the postal inspectors. See United States v. Leon, 468 U.S. 897, 914 (1984) (citations omitted). There was an ample showing of cause for the issuance of this warrant, and the affidavit incorporated in the warrant was as specific as necessary on the conditions that would have to be met before the warrant could be executed.
 
 
 21
 Because there was no defect in the warrant, we have no occasion to decide whether the postal inspectors could meet the test of "good faith," as that term is used in Leon. Obviously, however, we have no reason to suppose that the inspectors were not acting in complete good faith.
 
 III
 
 22
 Defendant Edmundson argues that the Lollitots magazine and the rifles taken in the search of his home must be suppressed because the officials conducting the search also seized a diary and calendars pertaining to daily events in his life, photographs of family members at a reunion, other information about family members, and service announcements from a local church. The argument is not persuasive.
 
 
 23
 "[D]iaries" were specifically listed among the items that the warrant directed the officials to search for and seize if found. So were "[r]ecords and documents reflecting names, addresses and/or other information, including lists addresses/telephone books" and "photographic papers ... movies, slides, video tape [and] negatives...." The history of Mr. Edmundson's bizarre relationships with young members of his family was detailed in the affidavit incorporated in the warrant, as was a reference to his recent pictures of little girls with looks of "utter terror" on their faces. It was entirely proper to interpret the specifications of the warrant in light of the information contained in the affidavit, and information on "family members" would appear to have been particularly pertinent.
 
 
 24
 Our knowledge of what was actually seized is somewhat sketchy, and we are not in a position to say that any of the items taken was outside the scope of the warrant. If the officers in fact took something that they ought not to have taken, however, the appropriate remedy would be an order requiring them to give it back. See Andresen v. Maryland, 427 U.S. 463, 482, n. 11 (1976). None of the challenged items was offered in evidence at trial, and disputes over items not offered in evidence do not normally justify suppression of evidence that was obtained properly. See United States v. Henson, 848 F.2d 1374, 1383 (6th Cir.1988), cert. denied, 488 U.S. 1005 (1989); Sovereign News Co. v. United States, 690 F.2d 569, 576 (6th Cir.1982), cert. denied, 464 U.S. 814 (1983); United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir.1987), cert. denied, 484 U.S. 1043 (1988). Suppression of probative evidence is a drastic remedy, see United States v. Matias, 836 F.2d 744, 747-48 (2d Cir.1988), and on the record before us it would make no sense at all to set Mr. Edmundson free--which is what the suppression he requests would amount to--simply because of the possibly improper seizure of one or two items that were not used in obtaining the conviction.
 
 IV
 
 25
 Although Mr. Edmundson presented an entrapment argument in the proceedings before the district court, in his brief on appeal he expressly forswears reliance on that defense. He does, however, ask us to reverse his conviction on the strength of the following dictum from United States v. Russell, 411 U.S. 423, 431-32 (1973):
 
 
 26
 "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165 (1952)."
 
 
 27
 In United States v. Moore, 916 F.2d 1131 (6th Cir.1990), which involved the use of law enforcement tactics similar to those employed in the case at bar, this court flatly rejected the defendant's contention that the government's conduct was so outrageous as to violate the due process clause of the Fifth Amendment. "Child pornographers," we observed, "commit serious crimes which can have devastating effects upon society and, most importantly, upon children who are sexually abused." Id. at 1139, citations omitted. Implicit in Moore and in the legislation is the concept that if the traffic in child pornography could be eliminated, the exploitation of children to fill the demand for such pornography would be eliminated too--a highly desirable result, whether or not the dissemination of child pornography tends, as many believe it does, to encourage child molestation by pedophiles who collect such material.
 
 
 28
 The task of eliminating the child pornography business is far from simple, of course. "[T]hose who ... traffic in child pornography," as we noted in Moore, "operate in secret...." Id. at 1139. Although we find them distasteful, undercover operations of the type used in Moore and in the case at bar would not seem inappropriate, given the clandestine nature of the evil at which they are directed.
 
 
 29
 Whatever the Constitution may require as a basis for conducting a "sting" operation against a private citizen--and other circuits have denied that there is a constitutionally mandated "reasonable basis" or "reasonable suspicion" test, see United States v. Luttrell, 923 F.2d 764 (9th Cir.1991) (en banc); United States v. Chin, --- F.2d ---- (2d Cir.1991); United States v. Jacobson, 916 F.2d 467 (8th Cir.1990) (en banc), cert. granted, 111 S.Ct. 1618 (1991)[1]--the authorities had obvious justification for the actions taken here. Mr. Edmundson's name was not picked at random out of a telephone book. Edmundson had personally engaged in criminal sexual conduct with young children in the past, and there was reason to believe that he was taking photographs of a sort which, given his background, could only have been a source of very serious concern to anyone familiar with that background.
 
 
 30
 Like the defendant in Moore, moreover, defendant Edmundson deliberately took a series of voluntary actions, including the payment of money, to get possession of material that he must have known was illegal. The solicitation to which Mr. Edmundson responded initially, it will be recalled, used the adjective "forbidden" in describing the wares being offered for sale. When Mr. Edmundson showed his interest by sending in a response card accompanied by two $1 bills, he was advised that to become a customer of Samoan Adventures he would have to sign an affidavit attesting that he was not a law enforcement official.[2] Mr. Edmundson signed and returned the affidavit, along with a customer survey form on which he checked a box indicating an interest in children 9 to 11 years old. The survey form also asked "[w]hat type of materials are so hard to get in your area you would like to see us ship them?" Mr. Edmundson wrote the following response by hand: "Pre-teen girls." Where the survey form asked for additional comments, Mr. Edmundson wrote "I love pre-teen girls by themselves."
 
 
 31
 The next mailing to Mr. Edmundson contained an advertisement describing available materials, with prices, and a form bearing this oath: "I swear under no circumstances shall I reveal to any law enforcement agency that I purchased materials from Samoan Adventures." Mr. Edmundson signed the oath and returned it, along with a check for $29.95 and an order for Vol. 4, No. 5 of Lollitots. The advertisement for this magazine left little room for doubt as to the nature of its contents. That Mr. Edmundson deliberately set about to break the law could hardly have been more obvious--and we are not prepared to say that the conduct of the government was so "outrageous" as to violate constitutional norms.
 
 
 32
 AFFIRMED.
 
 
 
 *
 The Honorable Robert B. Krupansky, United States Circuit Judge for the Sixth Circuit, assumed senior status on July 1, 1991
 
 
 **
 The Honorable Robert H. Bell, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The question on which the Supreme Court has granted certiorari in Jacobson involves entrapment, a matter not directly at issue in the case at bar. Unlike Mr. Edmundson, who responded affirmatively to every one of the government's mailings, the defendant in Jacobson initially resisted the government's solicitations
 
 
 [2]
 The text of this "Dirty Dozen" affidavit, as the literature called it, was as follows:
 "Under the penalty of law I hereby certify I am not any of the following: U.S. Custom Agent, a Postal Inspector of the United States or any other country, an agent of the Federal Bureau of Investigation, an undercover police officer, a member of any Gendarme [sic], a district attorney or assistant district attorney, a representative of the State, United States Justice Department, a sheriff, deputy sheriff, U.S. Marshal, a representative of Scotland Yard, an informant or snitch for any law enforcement agency, any other type of law enforcement representative or anyone trying to entrap anyone."