UNITED STATES of America, Appellee,

v.

German SEVERINO,
Defendant-Appellant.

No. 1042, Docket 85–1472.

United States Court of Appeals,
Second Circuit.

Argued April 4, 1986.
Decided Aug. 28, 1986.

**43**

Stephen F. Markstein, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., New York City, on brief), for appellee.

Joel B. Rudin, New York City, for defendant-appellant.

Before KEARSE, PRATT, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

German Severino appeals from a judgment entered in the United States District Court for the Southern District of New York after a jury trial before Mary Johnson Lowe, *Judge,* convicting him on one count of conspiring to possess and distribute cocaine, in violation of 21 U.S.C. § 846 (1982), and on one count of possessing 310.59 grams of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B) (1982), and 18 U.S.C. § 2 (1982). On appeal, Severino contends that the district court abused its dis-

cretion (1) in rejecting his attempt, pursuant to his agreement with the government, to plead guilty to a less serious charge and forcing him to stand trial on the indictment against him, and (2) in requiring him to exercise his peremptory challenges in the presence of the prospective jurors, thereby denying him a fair trial. We find no basis for reversal and accordingly affirm the judgment of conviction.

## I. BACKGROUND

Severino was indicted and convicted on two counts of narcotics violations: one count of conspiring with his cousin Roberti de Jesus Severino ("Roberti") and others to distribute and possess with intent to distribute cocaine, and one count of possession of approximately 310 grams of cocaine with intent to distribute it. Much of the evidence supporting the conviction was also presented to the court in a pretrial suppression hearing on the issue of whether there was probable cause for Severino's arrest.

### A. *The Alleged Events*

At the suppression hearing, the government presented evidence that on July 18, 1985, in an apartment on 158th Street in Manhattan, Roberti and another coconspirator arranged to sell a quantity of cocaine to an undercover agent of the New York Drug Enforcement Task Force. The agent testified that on that date, Severino drove Roberti from 158th Street to 175th Street, where Roberti informed the agent that the agent would receive a sample and that the sale would take place on 125th Street. When the agent protested at having to travel all around Manhattan for 300 grams of cocaine, Severino responded, in English, that 125th Street was only 10 minutes away and that all the agent had to do was "go upstairs and check out the sample of coke and then go down to 125th Street and then everybody would be on their way." Severino, Roberti, and the agent then entered an apartment in a nearby building; while Severino and the agent sat on a couch in the living room, Roberti and the man who had let them into the apartment

went into another room and closed the door; when they returned, Roberti displayed a plastic bag containing a small quantity of cocaine. The agent inspected the cocaine and agreed to buy.

Severino, Roberti, and the agent then left the apartment. Severino drove Roberti, with the agent following, to 125th Street, where Roberti went into a building and returned with a brown paper bag. Severino backed up and double-parked beside the agent's car. Roberti got into the car beside Severino and, when the agent leaned in, showed the agent the contents of the bag, which was stipulated at trial to contain approximately 310 grams of 85% pure cocaine hydrochloride. Upon a prearranged signal from the agent, other law enforcement officers promptly arrested Roberti and Severino. When arrested, Severino had in his possession .24 grams of cocaine.

### B. *The Commencement of Trial and the Proposed Guilty Plea*

Jury selection for Severino's trial commenced on November 18, 1985. On the first round of the process, Severino exercised two of his peremptory challenges to prospective jurors. After the court clerk had announced these challenges, defense counsel, in a sidebar conference, "object[ed] to being asked to exercise [his] challenges in so public a way." The court overruled his objection, stating, "This is the way I select a jury. They have a right to know who is challenging whom." Severino made no further challenges to prospective jurors but moved for a mistrial, arguing that the court's requirement that each side's peremptory challenges be exercised publicly had the effect of forcing defense counsel to choose between accepting an unsatisfactory jury and risking the jury's speculations as to why the defendant was exercising peremptory challenges. The court denied the motion.

On the following day, when the presentation of evidence was due to begin, Severino sought to enter a plea of guilty to a one-count information charging him with pos-

sessing .24 grams of cocaine with intent to distribute it. Under the agreement, the indictment charges against Severino would be dismissed at the time of his sentencing, and the government would also refrain from prosecuting Severino, an alien, for unlawful entry into the United States in July 1985. According to the Assistant United States Attorney ("AUSA"), the plea bargain required Severino not only to plead guilty to possession of .24 grams of cocaine with intent to distribute, but also to allocute "to essentially a conscious avoidance of the underlying facts" of the count of the indictment that charged him with possession of 310 grams of cocaine.

After advising and questioning Severino, through an interpreter, to ascertain that his plea of guilty was knowing and voluntary, Judge Lowe advised Severino that she would question him about the charges in the information, and warned that if he did not answer truthfully he "would be subject to an additional charge of making a false statement to a judicial officer." In response to the court's questioning about the charges, Severino stated that on July 18, 1985, he had had a quarter of a gram of cocaine in his possession that he intended to use and to give to two friends for them to use. When asked what else he had done on that date, he told the court that "Roberti Severino asked me for a ride to 125th Street and a minute before I was arrested I suspected that he was dealing in drugs. It was too late for me to get out of the problem." In response to further questioning by the AUSA, Severino stated that on July 18, he had been unaware that Roberti sold cocaine, that he had not seen the sample of cocaine displayed by Roberti in the 175th Street apartment, that he had not told the undercover agent that it would only take 10 minutes to drive to 125th Street, but had merely stated that to Roberti in response to Roberti's question; and that he did not speak English. Indeed, Severino stated that he did not speak even a little English, although he drove a taxi cab in Manhattan. After further questioning, Judge Lowe stated that based on "the totality of his responses," she did not be-

lieve Severino was being truthful. She determined not to ask him any further questions, stating that she did "not wish to subject him to additional charges." Judge Lowe rejected the proffered guilty plea, deciding to "leave it up to the jury to decide where the truth is."

Trial then commenced on the two charges in the indictment, and Severino was convicted on both counts. He was sentenced to a term of imprisonment of one year and one day on the conspiracy count, to be followed by one day's probation on the possession count. This appeal followed.

## II. DISCUSSION

On appeal, Severino contends that the district court abused its discretion in refusing to allow him to enter, in satisfaction of all charges against him, a plea of guilty to the information charging him with possession of .24 grams of cocaine, and he asks that the judgment of conviction be vacated and that the case be remanded for acceptance of his guilty plea on the lesser charge and for resentencing. Alternatively, he contends that he is entitled to a new trial because the court's refusal to allow him to exercise his peremptory challenges outside the presence of the jury denied him a fair trial. We reject both contentions.

### A. *The District Court's Rejection of the Guilty Plea*

■ Fed.R.Crim.P. 11(a) provides that, in general, a defendant may plead guilty, not guilty, or nolo contendere. It is well established, however, that a defendant has "no absolute right to have a guilty plea accepted." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford*, 400 U.S. 25, 38 n. 11, 91 S.Ct. 160, 167 n. 11, 27 L.Ed.2d 162 (1970); *Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211 (1962); *Siegel v. State of New York*, 691 F.2d 620, 625 n. 4 (2d Cir.1982), *cert. denied*, 459 U.S. 1209, 103 S.Ct. 1201, 75 L.Ed.2d 443 (1983). A trial judge is not required to "accept every constitutionally

valid [i.e., knowing, voluntary, and intelligent] guilty plea mearely because a defendant wishes so to plead," *North Carolina v. Alford*, 400 U.S. at 38 n. 11, 91 S.Ct. at 167 n. 11, and "may reject a plea in exercise of sound judicial discretion," *Santobello v. New York*, 404 U.S. at 262, 92 S.Ct. at 498.

While Rule 11(e)(2) expressly provides that if a plea agreement calls for the government to move for dismissal of other charges, "the court may accept or reject the agreement," Rule 11 does not purport to establish criteria for the acceptance or rejection of a plea agreement. "Such a decision is left to the discretion of the individual trial judge." Advisory Committee Note to Fed.R.Crim.P. 11. *See* H.R. Rep. No. 247, 94th Cong., 1st Sess. 6, *reprinted in* 1975 U.S.Code Cong. & Ad. News 674, 678 ("The procedure is not mandatory; a court is free not to permit the parties to present plea agreements to it."); *United States v. Bean*, 564 F.2d 700, 702 (5th Cir.1977) ("The drafters of the Rule intended for the judge to retain discretion in accepting plea bargains.").

Rule 11(f) provides that the court should not enter judgment on a plea of guilty unless it is satisfied that there is a factual basis for the plea, but the Rule does not indicate whether, when such a factual basis has been established, the court has discretion nonetheless to reject the plea. Some courts have taken the position that even if there is such a basis, where the plea is to a lesser charge or otherwise has the effect of restricting the judge's sentencing authority, and is not "both reasonable and necessary to secure a legitimate and important prosecutorial interest," such as "obtaining evidence, avoiding a prosecution of uncertain success, or conserving prosecutorial resources," the district court has "wide latitude to reject a plea bargain." *United States v. Escobar Noble*, 653 F.2d 34, 36–37 (1st Cir.1981); *United States v. Bean*, 564 F.2d at 703–04 (plea may be rejected on ground that it would result in defendant's receiving too light a sentence); *United States v. Moore*, 637 F.2d 1194, 1196 (8th Cir.1981) (per curiam) (district court is un-

der no duty to accept a plea of guilty or to state reasons for rejecting a plea). The District of Columbia Circuit has held that where the plea has a factual basis the district court should accept it. *United States v. Gaskins*, 485 F.2d 1046, 1048 (D.C.Cir.1973) (per curiam) (abuse of discretion to reject plea on sole ground that defendant refused to admit guilt); *see also United States v. Delegal*, 678 F.2d 47, 50 (7th Cir.1982) (abuse of discretion to reject a plea on ground that plea agreement was not in writing where plea proceeding, including agreement, has been transcribed by court reporter).

This Court has not yet explored the contours of a district court's discretion to reject a plea of guilty. *See United States v. Navedo*, 516 F.2d 293 (2d Cir.1975). In *Navedo*, we upheld the rejection of a plea agreement on the ground that there was an insufficient factual basis for the plea. Then-Chief Judge Kaufman dissented, pointing out that in an allocution before the very judge who will sentence him, a defendant may well seek to minimize his involvement in nefarious activities, and that where the court may look to other evidence in the recorded proceedings before it and determine that there is a factual basis for the plea, the plea should not be rejected.

Severino contends that his allocution established that there was a factual basis for his plea of guilty to the charge in the information and that the court's rejection of his plea on the ground that he was untruthful in his description of the events leading to his arrest was in effect an insistence that he admit a factual basis for the charges on which he was not pleading guilty. He argues that, where there is no inherent impropriety in the terms of a plea bargain, the court is limited to protecting the defendant's rights. We reject these arguments.

The proposition that a facially proper plea agreement must be approved unless disapproval is required by a concern for the rights of the defendant is a far too restrictive view of the court's proper concerns. The plea bargaining process is "an essen-tial component of the administration of justice," *Santobello v. New York*, 404 U.S. at 260, 92 S.Ct. at 497, and if the court has reasonable grounds for believing that acceptance of the plea would be contrary to the sound administration of justice, it may reject the plea.

■ One such ground, of course, is the defendant's failure to "satisfy [the court] that there is a factual basis for the plea." Fed.R.Crim.P. 11(f). Here, the only evidence that Severino intended to distribute the .24 grams of cocaine found in his possession upon his arrest was his own testimony. So far as we are aware there was no other evidence to which the court could look for verification, and certainly this amount of cocaine was sufficiently small to be consistent with personal use rather than distribution. Thus, to be satisfied that there was a factual basis for the plea, the court would have had to find Severino a credible witness. The court did not find him credible, and there was ample basis in the record for its conclusion that Severino was not being truthful.

The court had heard some two weeks earlier the testimony of the undercover agent who described Severino's participation in the events of July 18, 1985, including his attendance at the various displays of cocaine and his urging the agent to inspect the cocaine sample and proceed from 175th Street to 125th Street to complete the transaction. The court refused to credit Severino's version of the events of July 18 over the version testified to by the undercover agent, finding that, based on "the totality of his responses," he was being untruthful. Given this finding, the court was entitled to infer that Severino misrepresented also the facts underlying his plea to the information, both in order to avoid being sentenced on a more serious charge, and to avoid having the court take into account his more serious behavior in sentencing him on the lesser charge.

In sum, we conclude that the district court did not abuse its discretion in refusing to accept Severino's plea on the

ground that it believed he was, in his plea allocution, not testifying truthfully.

We note the government's additional argument that the court's rejection of the proffered plea was proper because Severino's refusal to admit his conscious avoidance of knowledge of Roberti's drug dealing constituted a breach of the plea agreement. While we need not reach this ground, it is perhaps significant that the district court did not base its rejection on such a breach; Severino accurately points out that the government did not state to that court that his allocution failed to meet his part of the plea bargain. The government's argument that its dissatisfaction with Severino's allocution was evident in the tone of its questioning at the plea hearing is unpersuasive. If the government wishes to rely on an argument that the defendant's performance was unsatisfactory, it must take care to make a record in the district court that is susceptible to appropriate review in an appellate court. It may not rely on its representations as to the inflections of its prosecutors.

### B. *The Exercise of Peremptory Challenges*

█ In support of his contention that he was denied a fair trial by the district court's denial of his request to exercise his peremptory challenges outside the presence of the prospective jurors, Severino claims that "requiring challenges to be openly announced and attributed to a party ... invite[s] speculation as to the defendant's motives [and] create[s] a clear risk that remaining jurors, or prospective panelists in the audience, would be offended by the challenge of their friends or persons with whom ... they identified." He takes comfort from language in a prior decision of this Court in which we upheld the district court's practice of entertaining peremptory challenges within the sight and hearing of the prospective jurors "especially ... absent a request by counsel to the contrary," *United States v. Ploof,* 464 F.2d 116, 119 n. 4 (2d Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). He argues that in the face of a request to the contrary the district court abuses its discretion in following this practice, and that even if the practice is not an abuse of discretion, this Court should exercise its supervisory authority to require district courts to allow counsel to exercise challenges out of the jury's presence when such a request is made. We find no abuse of discretion and decline to exercise our supervisory authority in the way Severino requests.

In empaneling the jury in this case, Judge Lowe employed the "jury box" system, which is the traditional method of jury selection, *see* Sand, *Jury Selection and Race Discrimination,* N.Y.L.J., June 10, 1986, at 3, col. 1. In this system, 12 prospective jurors are seated in the jury box and questioned to determine whether they should be excused for cause. Any prospective juror who is excused for cause is immediately replaced. After 12 prospective jurors have been seated and have survived all challenges for cause, the defendant and the prosecutor proceed to exercise their allotted peremptory challenges, in some prescribed pattern of alternation, against the currently seated prospective jurors. *See generally United States v. Blouin,* 666 F.2d 796, 796–97 (2d Cir.1981); Sand & Reiss, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit,* 60 N.Y.U.L.Rev. 423, 425 n. 16 (1985).

Frequently, peremptory challenges are exercised through the use of a jury board, which holds a card for each of the prospective jurors. *See generally* Sand, *Jury Selection and Race Discrimination,* N.Y. L.J., June 10, 1986, at 1, col. 4; *id.* at 3, col. 1 n. 3. The jury board is passed first to defense counsel, who may exercise the challenges allowed the defendant on that round by turning over the cards with the names of the challenged jurors. In some courts any jurors challenged by the defense in a given round are replaced before the government exercises its challenges. This party-by-party system of implementing challenges is the method that was used in the present case. In other courts, the jury board is passed from the defense to the prosecution, the latter exercises its challenges, and the jurors challenged by

both the defense and the prosecution on a given round are then excused together and replaced, without disclosure of which side challenged which venirepersons. This round-by-round system, apparently, is the method Severino would have preferred. For the reasons below, we conclude that the district court's refusal to adopt the method preferred by Severino was not an abuse of discretion.

Preliminarily, however, we note our disagreement with the district court's statement, in rejecting Severino's request to be permitted a nonpublic exercise of his challenges, that prospective jurors "have a right to know who is challenging them." Jurors have no such right, and, indeed, it would be beneficial to the administration of justice if an equitable method of jury selection could be devised that would neither disclose to the jury which party had excused a particular venireperson nor reduce the opportunity for either party to make the most intelligent use of his or its peremptory challenges. Notwithstanding our rejection of the court's stated rationale for the exercise of its discretion to adhere to the party-by-party version of the box selection method, we conclude that its decision was not ground for reversal.

The jury box system, in both the party-by-party and round-by-round versions, has advantages and disadvantages. *See United States v. Blouin*, 666 F.2d at 798 (one advantage of the box system, in either version, over the so-called "struck jury" system, is that the box system may decrease a party's opportunity to shape a jury along racial or other class lines). None of the disadvantages, however, has been found to infringe impermissibly on the defendant's right to an unbiased and impartial jury.

The general standard for measuring the acceptability of procedures through which peremptory challenges are exercised was articulated in *Pointer v. United States*, [151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)]. "Any system for the empanelling of a jury that pre[v]ents or embarrasses the full, unrestricted exercise by the accused of [his right to challenge peremptorily] must be condemned." Within those broad confines, however, trial courts retain a broad discretion to determine the way peremptory challenges will be exercised. *United States v. Blouin*, 666 F.2d at 797. The principal disadvantage inherent in the jury box system is that

each side must accept at least one juror whom he has not had an opportunity to challenge. Whoever goes second in the final round will have used his last challenge before knowing the identity of the juror who replaces that last challenge. And if each side has only one challenge in the final round, the side going first in the final round will have used his last challenge before knowing the identities of both the juror who replaces his final challenge and the juror who replaces his adversary's final challenge.

*Id.* at 798 (footnote omitted). In *Blouin*, the court used the round-by-round version of the jury box method that Severino would have preferred here. Although we ruled that the adoption of this method was within the district court's discretion, we observed that this version exacerbated the disadvantage described above because the party challenging last in the final round would likewise have to exercise his final challenge without knowing the identity of two jurors, not just one: the juror who will replace his final challenge and the juror who will replace his opponent's final challenge.

Thus, the method requested by Severino has disadvantages that persuade us both that the district court was well within the bounds of proper discretion not to adopt it and that we should not, in the exercise of our supervisory power, order its adoption. We note further, that the benefit Severino anticipates from the adoption of the round-by-round system may well be illusory, for one judge has recently noted that when the jury box method is used, the jurors "generally know who has challenged them" even when the defendant's and the prosecutor's challenges are announced simultaneously. Sand, *Jury Selection and Race Discrimination*, N.Y.L.J., June 10, 1986, at 3, col. 2 & n. 10.

Finally, we note that prospective jurors in the Southern District of New York are

provided with a copy of the *Handbook for Jurors Serving in the United States District Court* (1975), published by authorization of the Judicial Conference of the United States, and that this handbook advises jurors that "being eliminated from the jury panel by a peremptory challenge is no reflection upon their ability or integrity." *Id.* at 5. An instruction along these lines would also no doubt have been forthcoming from the court if Severino had requested one, to ensure that Severino was not prejudiced by his use of peremptory challenges.

### CONCLUSION

The judgment of the district court is affirmed.