STATE of Iowa, Appellee,

v.

Mary Jane HAGER, Appellant.

No. 99–1251.

Supreme Court of Iowa.

July 5, 2001.

Rehearing Denied July 30, 2001.

Dean Stowers of the Rosenberg Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Roxann M. Ryan, Assistant Attorney General, John P. Sarcone, County Attorney, and Michelle Chenowith and Jeff Noble, Assistant County Attorneys, for appellee.

CADY, Justice.

In this appeal, we must decide if the district court may reject a plea agreement in a criminal case for the sole reason that it was tendered after a court-imposed deadline for the submission of plea agreements. We conclude the district court abused its discretion in refusing to accept the plea. We reverse the judgment and sentence imposed by the district court and remand the case for further proceedings.

## I. Background Facts and Proceedings.

The facts giving rise to this criminal proceeding are both frightening and bizarre. They can best be described as a product of the common human inclination to jump to conclusions based on the perceptions of an event. They began when Mary Hager learned that her son, Rob, was a suspect in a bank robbery with an accomplice named Michael Weckman. Hager was well acquainted with Weckman. He had been Rob's friend since junior high school. It was not a friendship Hager encouraged. In Hager's words, Weckman was "evil." On more than one occasion he had threatened Hager or her family with violence.

Television newscasts reported that local officials and FBI agents were searching for the two men. Rob, meanwhile, left messages on Hager's answering machine, pleading for her help and claiming that Weckman had a gun to his head. He also called his girlfriend, Charity, who told Hager that Rob wanted to surrender. Charity planned to meet Rob under a bridge crossing the Des Moines River at SE 14th Street. Hager agreed to join her.

Hager drove to Charity's apartment in her husband's truck. She left a phone

message with a Des Moines police detective about their plans. While waiting for the detective to return her call, Hager retrieved a loaded gun from the truck. She thought she might need it for protection. The detective never returned her call.

Hager and Charity, along with Charity's fifteen-year-old sister, headed for the Harriett Street boat ramp on the Des Moines River in Charity's Ford Bronco. It was about 2:30 a.m. When they reached the top of the hill leading down to the ramp, they observed a car facing the river with its trunk lid open. The women speculated that Rob's body was in the trunk. Hager, who was in the open back seat of the Bronco, yelled for her son but received no response.

There were two individuals near the car next to the river. They were Jason Howell and Lynett Bradwell. However, they had no connection to the events up to this point in time. Instead, they were at the river fishing. Howell and Bradwell began to feel increasingly uneasy about the presence of the Bronco at the top of the hill and decided to leave. They thought perhaps the Bronco was stalled and the occupants needed help. They put their fishing gear in the trunk of their car and headed up the ramp toward where the Bronco was stopped.

As Bradwell and Howell approached the Bronco, they saw Hager lean over the back seat of the Bronco with her arms pointed toward them. Suddenly a shot rang out, and a bullet hit their vehicle. They quickly drove around the Bronco, saw another

flash and heard another gun shot. Frightened that someone was out to kill them, they sped onto SE 14th Street.

Hager and Charity, still thinking Rob was in the trunk, gave chase at sixty miles per hour. Hager dialed 911 on her cell phone to summon help. Bradwell and Howell, meanwhile, pulled into a convenience store parking lot to call the police. As they ran from their car, Hager and Charity saw them and realized their mistake. They so advised the 911 dispatcher and met police at a nearby gas station where they were immediately arrested.

The State charged Mary Hager with terrorism with intent, a class "C" forcible felony, and going armed with intent, a class "D" felony. See Iowa Code §§ 708.6, .8 (1997).[1] Hager's counsel filed defenses of diminished capacity and self-defense or defense of others. See Iowa Code §§ 701.5 (intoxicants or drugs), 704.3 (defense of self or others). While preparing for depositions, defense counsel became concerned about Hager's mental state. The trial date was continued, first to permit consultation with Hager's psychiatrist and, later, to enable the psychiatrist to complete a formal forensic psychiatric evaluation. The examination resulted in a diagnosis of post-traumatic stress disorder and recurrent depression. At no time was Hager judged incompetent to stand trial or assist in her defense.

Plea negotiations between the State and Hager were ongoing. Hager, believing her actions were justified by fear for her son's life, repeatedly expressed reluctance

---

1. Iowa Code section 708.6 states, in pertinent part:

A person commits a class "C" felony when the person, with the intent to injure or provoke fear or anger in another, shoots ... a dangerous weapon at, into, or in a ... vehicle ... and thereby places the occupants or people in reasonable apprehension of serious injury. . . .

Section 708.8, defining the crime of going armed with intent, states:

A person who goes armed with any dangerous weapon with the intent to use without justification such weapon against the person of another commits a class "D" felony.

to plead guilty, even to substantially reduced charges with a recommendation by the State for probation.

Trial was eventually set for April 19, 1999, and the district court conducted a final pretrial conference on April 15. At the final pretrial conference, the State again offered to reduce the charges in exchange for a plea of guilty.[2] Hager, however, reiterated her refusal to accept the plea offer. In response, the district court explained to Hager and her attorney:

> [I]t is the practice in this district that any plea offers that result in a plea must take place no later than the last court day before the date of trial. . . .
>
> . . . .
>
> Under . . . our standard procedure in Polk County, the Defendant could enter a plea of guilty as charged once the trial date arrives but we have been disinclined to take pleas to reduced charges on the morning of trial because of the inconvenience that [it] causes for the courts, counsel, witnesses, and the . . . jurors. . . .[3]

Hager refused to budge in response to the admonition by the district court. The court then concluded the proceeding by saying, "The plea offer is not accepted and the case will simply go to trial."

The case then came before the district court for trial as scheduled on April 19.

Prior to the commencement of the selection of the jury, the State again offered Hager the plea agreement but did not believe the court would accept the plea at this point in the proceedings. Hager eventually expressed a willingness to accept the plea agreement and the attorneys consulted with the district court judge in chambers to determine if he would accept the plea.[4] A bill of exceptions executed by the court summarized the proceedings:

> On the morning of April 19, 1999 prior to the commencement of jury selection, the court was advised by counsel for the State and the Defendant that the parties were interested in disposing of the charges against the Defendant pursuant to a plea agreement whereby the county attorney would reduce the charges against the Defendant and Defendant would enter *Alford* pleas to the reduced charges. The court explained to both counsel, as it had on the record on April 15, that such a disposition on the morning of trial was contrary to the court's policy and was therefore unacceptable.

The case then proceeded to trial. The jury eventually returned verdicts of guilty to both charges of the trial information following a five-day trial. After the district court denied a motion for new trial and a motion in arrest of judgment, Hager was sentenced to a term of incarceration.

---

2. The plea bargain offered by the State would have reduced the charges to two counts of assault with a weapon, an aggravated misdemeanor.

3. The plea deadline policy was an unwritten rule implemented by the district judges in Polk County. It was established after the Chief Judge of the Fifth Judicial District created a committee to improve the processing of felony cases in Polk County. The policy provided that the district court would not accept plea agreements to lesser charges on the day of trial without compelling circumstances or good cause.

4. The basic difference between the plea discussions on the morning of trial and the plea agreement offered at the pretrial conference was that the plea bargain on the morning of trial involved an *Alford* plea. Hager earnestly believed that her actions were not criminal under the circumstances, and she could not plead guilty to a crime she believed she did not commit. The *Alford* plea would have allowed Hager to enter a plea without an admission of guilt.

Subsequent post-trial hearings confirmed that the district court rejected the plea offer solely because it was presented after the plea deadline. The court explained during the hearing on a motion for new trial:

[T]he record is clear as to what transpired [on the morning of trial].... The Court indicated to counsel on the morning of trial a plea deadline had been set, the plea deadline had expired and as a consequence, the case would go to trial.

In overruling the motion, the district court further remarked:

This is simply a case in which the court set a guilty plea deadline for very good reasons and the Defendant did not avail herself of [it]....

This is not form over substance. This is concern not about Mary Jane Hager but about every other Mary Jane Hager that may need access to our courts and [e]nsuring that there are ample judges, jurors, witnesses, counsel available to deal with all of them.

Hager appeals. She raises numerous issues. However, our review is confined to the single issue of whether the district court abused its discretion by refusing to entertain the plea agreement based solely on the court's policy of refusing pleas on the morning of trial.

## II. Standard of Review.

We review a decision of the district court to reject a guilty plea for an abuse of discretion. *See State v. Wenzel*, 306 N.W.2d 769, 771 (Iowa 1981). To the extent the issue also raises due process concerns, our review is de novo. *State v. Griffin*, 564 N.W.2d 370, 372 (Iowa 1997).

## III. Plea Deadline.

Plea bargaining has long been recognized as "an essential component of the administration of justice." *Santobello v. New York*, 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427, 432 (1971). Foremost, "[i]t leads to the prompt and ... final disposition of most criminal cases...." *Id.* at 261, 92 S.Ct. at 498, 30 L.Ed.2d at 432. This affords the prosecutor additional leverage in prosecuting other crimes, and allows defendants who acknowledge guilt to spare themselves and the public an expensive trial. *See United States v. Jackson*, 390 U.S. 570, 584, 88 S.Ct. 1209, 1217–18, 20 L.Ed.2d 138, 148 (1968). Yet, as common as plea agreements are in our criminal justice system, a defendant has no constitutional right to have a court accept a guilty plea. *Wenzel*, 306 N.W.2d at 771. Instead, "courts have discretion to refuse to accept [a] guilty plea[ ]." *Farley v. Glanton*, 280 N.W.2d 411, 415 (Iowa 1979); *see* Iowa R.Crim. P. 8(2)(b) ("court may refuse to accept a plea of guilty"). This discretion is necessary in light of the variety of considerations inherent in the process.

There may be a number of reasons for courts to refuse to accept a plea bargain. Those reasons, however, have "normally centered on doubts with the defendant's guilt. *See Farley*, 280 N.W.2d at 413–16 (trial court refused to accept plea when it believed defendant had possible entrapment defense); *see also State v. Marsan*, 221 N.W.2d 278, 280 (Iowa 1974) (no requirement that court refuse plea when record supported defendant's guilt). This case presents the first time we have considered the court's ability to refuse a plea bargain because it was presented after deadlines for pleas established by the court.

The discretion possessed by trial courts to refuse to accept a guilty plea is broad but not unlimited. *Farley*, 280 N.W.2d at 415. Yet, the parameters of this discretion have no clear lines, and

there are no established criteria or standards to consider in the exercise of discretion. *United States v. Robertson*, 45 F.3d 1423, 1437 (10th Cir.1995) (citing 1 Charles Alan Wright, *Federal Practice and Procedure* § 175.1 (1982)). Thus, we must examine the boundaries of this discretion by considering whether it is broad enough to permit a trial court to reject a plea offer for the sole reason that it is made after the expiration of a deadline for pleas.

A number of courts have held that a trial court acts within its discretion by refusing to accept a plea agreement tendered after a plea deadline. *See United States v. Gamboa*, 166 F.3d 1327, 1331 (11th Cir.1999); *United States v. Ellis*, 547 F.2d 863, 868 (5th Cir.1977); *People v. Cobb*, 139 Cal.App.3d 578, 188 Cal.Rptr. 712, 716 (1983); *People v. Jasper*, 17 P.3d 807, 813–14 (Colo.2001); *People v. Grove*, 455 Mich. 439, 566 N.W.2d 547, 558 (1997); *State v. Brimage*, 271 N.J.Super. 369, 638 A.2d 904, 908–09 (App.Div.1994). Other courts have determined that trial courts abuse their discretion by rejecting plea agreements because they did not meet a guilty plea deadline. *See United States v. Shepherd*, 102 F.3d 558, 562–63 (D.C.Cir. 1996); *Robertson*, 45 F.3d at 1438; *United States v. Moore*, 916 F.2d 1131, 1135–36 (6th Cir.1990); *State v. Sears*, 208 W.Va. 700, 542 S.E.2d 863, 867–68 (2000); *see also Hare v. Superior Ct.*, 133 Ariz. 540, 652 P.2d 1387, 1388–90 (1982) (rule imposing deadlines on the acceptance of pleas exceeded court's jurisdiction). Although the factual circumstances in some of these cases may be responsible for producing the outcome, the pivotal dispute among the various courts centers on the balancing of the myriad of competing interests.

 On one hand, there are many factors which weigh against the exercise of discretion to refuse to accept a guilty plea because it was presented after a guilty plea deadline. Plea agreements are not solely within the realm of courts. *See Robertson*, 45 F.3d at 1437–38. The differing roles of the court and the prosecutor within our system of justice can either broaden or narrow the discretion of courts to reject pleas depending on the type of plea agreement presented. While plea agreements that impact sentencing powers of courts generally fall within the discretion of the court, plea bargains which involve charging decisions are primarily within the discretion of the prosecutor. *See id.* at 1437. Thus, the court's role becomes limited when the plea agreement presented to the court does not bind the sentencing powers of the court. *See United States v. Miller*, 722 F.2d 562, 564 (9th Cir.1983); *United States v. Maggio*, 514 F.2d 80, 82 (5th Cir.1975). The doctrine of separation of powers compels the judiciary to give respect to the independence of the executive branch. *Miller*, 722 F.2d at 565. When a plea agreement does not directly impact the sentencing powers of the court, as in this case, the decision to reduce the charges primarily rests with the discretion of the prosecutor. *See id.* at 564–66. This discretion is impeded when the court exercises its discretion by refusing to accept the plea. *See id.* at 566.

 Plea agreements also affect fundamental interests of the defendant. Although the defendant has no constitutional right to present a plea, the process nevertheless involves interests as fundamental as freedom and imprisonment. *See id.* at 565. In the context of sentencing, where these same interests are present, we demand independent consideration by the sentencing court in each case, and reject the use of fixed policies. *See State v. Jackson*, 204 N.W.2d 915, 917 (Iowa 1973). Likewise, a fixed policy should not be followed in rejecting plea agreements. *See Miller*, 722 F.2d at 564–65. The exer-

cise of discretion in the area of imprisonment and freedom has been one of the hallmarks of our judicial system.

■ On the other hand, it is important for our legal system to be effectively and efficiently administered. Consequently, the efficient processing of a case has become an important element in the administration of our courts, and a plea deadline in criminal cases is one method commonly utilized by courts to help manage increasing demands on the criminal dockets. Deadlines are a way to help distinguish those cases that do not ultimately need a trial from those cases that require a trial, at a point in the process to help ensure that the time and resources involved in the preparation for trial are not devoted to those cases that will ultimately be resolved by a guilty plea. A plea deadline becomes a cutoff point for administrative purposes, and enables the court to direct its trial resources to those cases in which the parties do not reach a plea agreement by a certain date. This is not only important to the efficient operation of our criminal docket, but also to the overall operation of our court system. Criminal cases are given priority over most civil cases. Consequently, civil trials are delayed when criminal cases are scheduled for trial but ultimately settled on the morning of trial by a plea bargain. *See Cobb*, 188 Cal. Rptr. at 713–14.

■ Additionally, strict adherence to guilty plea deadlines is justified as a means of giving the deadline integrity. *See Ellis*, 547 F.2d at 868. If parties are allowed to submit plea agreements after the deadline has passed, it would render the deadline meaningless. *Id.* Thus, deadlines operate with uniformity to all litigants.

Those courts that have approved plea deadlines have generally determined that the traditional deference given to prosecutors to reduce charges and the interest of the defendant to plead guilty are outweighed by the needed judicial discretion to control the court schedule and effectively utilize court resources. *See Gamboa*, 166 F.3d at 1331; *Ellis*, 547 F.2d at 868; *Grove*, 566 N.W.2d at 558. Thus, they consider the discretion to refuse to accept a plea bargain to be broad enough for the court to reject plea bargains presented after a deadline. *Id.* Moreover, these courts recognize that court-imposed plea deadlines have good cause exceptions which permit some late pleas to be accepted and to overcome any claims of arbitrary action. *See Jasper*, 17 P.3d at 814.

The trial court in this case, in rejecting the late plea tendered by Hager, followed the rationale articulated by those courts which have approved plea deadlines. In particular, it observed that it was necessary to strictly adhere to the deadline in this particular case in order to achieve the greater overall goal of efficient management of our entire court system.

■ In our consideration of the competing interests at stake, we recognize the vital need to administer courts in an efficient manner. However, efficiency must always be compatible with fairness, and fairness must consider the fundamental principles which drive our system of justice and the rights and liberties of each individual. There are many procedures courts could employ that would quickly eliminate backlogs and enable our legal system to run with the efficiency of an assembly line, but they are not implemented because they would offend the principles fundamental to our system of justice.

■ Plea deadlines not only adversely impact prosecutorial discretion and individual interests, but strict adherence to deadlines impedes the very discretion of

the court. Like the use of a fixed policy in sentencing, a fixed plea deadline is the very antithesis of discretionary decision-making. *See Jackson,* 204 N.W.2d at 916. It precludes the exercise of discretion. *See Miller,* 722 F.2d at 565. A court abuses its discretion when it fails to exercise any discretion.

The State argues the plea deadline in this case was not actually fixed because it included a good cause exception. Thus, the State asserts that the court did not strictly adhere to the deadline but necessarily considered any good cause ground that would have permitted a late plea. The State claims the good cause component to the deadline renders the decision-making process discretionary.

It is important to observe that the good cause exception to the deadline in the case was not broad enough to include a mere change of mind or a renegotiation of the plea bargain by the parties. Thus, the deadline is fixed for litigants, like Hager, who simply change their mind after the plea deadline. Moreover, the sole reason the court rejected the plea in this case was because it was late. The court strictly adhered to the deadline and refused to consider the individual pressures and indecision faced by Hager.

In balancing the need for deadlines against the fundamental principles which are impacted by deadlines, we further recognize that the underlying rationale supporting the deadlines is flawed. While deadlines are imposed as a means to eliminate the expense and time of assembling witnesses, jurors, and others for a trial that never occurs because the defendant pleads guilty on the morning of trial, the refusal to accept such a plea on the morning of trial only compounds the time and expense when the parties are forced to try the case. The trial may last several days or weeks, and the expense is actually increased exponentially. Moreover, the function of a jury and the other components of a trial can at times extend beyond those matters that ultimately result in a verdict. At times, the very presence of a jury on the morning of trial can engender a desire from the defendant to plead guilty that cannot be replicated at any prior time in the process. Thus, the jury's function to help resolve cases can be performed at times by its mere presence on the morning of trial. If the process results in a conclusion to a case on the morning of trial which was not possible the day before, the time and resources devoted to the case were not wasted. It is also important to consider that a criminal case that concludes by a trial often continues to burden the court system with the expense of an appeal, as in this case, or other postconviction proceedings. On the other hand, a plea of guilty results in the waiver of a variety of rights, and normally concludes the case without the expense of further proceedings. *See State v. Hook,* 623 N.W.2d 865, 867 (Iowa 2001).

In balancing administrative benefits of deadlines against those rudimentary principles which are impacted by the deadlines, we observe that our system of justice has some costs that cannot be necessarily eliminated or reduced by principles of efficiency recognized in private business or even in other aspects of government. Our system of justice must strive to be efficient, but efficiency in a justice system does not necessarily have the same meaning as it does in the operation of a business. The goals are different. Justice cannot be produced by an assembly line, and the principles of court administration must not become detached from those principles which lie at the heart of our system of justice. Instead, they must work in harmony with those basic principles inherent in our concept of a justice system.

 We conclude the trial court in this case abused its discretion by refusing to consider the terms of the plea agreement solely because it was presented after the deadline for pleas set by the court. A missed plea deadline, alone, will not support the refusal to accept a plea agreement. There must be additional reasons. These additional reasons are broad and fall within the ambit of the court's power over the administration of justice. *See United States v. Severino*, 800 F.2d 42, 46 (2d Cir.1986) (court may reject plea if it has reasonable grounds to believe it would be contrary to the sound administration of justice). They may relate to the terms of the plea bargain, the proper disposition of the case, or even any underlying impunity by a defendant toward the efforts by the court to control its docket through deadlines. Thus, a court could act within its discretion to refuse to accept a guilty plea after a missed deadline if the defendant ignores the deadline by making no reasonable effort to reach a plea agreement prior to the deadline.

 Courts are given discretion in this area of the law, and fail to exercise it by strictly adhering to a plea deadline. The benefits of strict adherence to plea deadlines do not outweigh the need for judges to exercise discretion, the deference to the discretion of prosecutors, and the rights of the defendant. Moreover, Hager clearly suffered prejudice by the abuse of discretion. *See Shepherd*, 102 F.3d at 563.

### IV. Conclusion.

We reverse the conviction and remand the case to the district court with di-

rections to consider the request by Hager to enter a plea of guilty pursuant to the terms of the plea bargain offered prior to trial.[5] In exercising discretion to accept or reject the plea, the court may not refuse the plea for the sole reason that it was tendered after the plea deadline.

### REVERSED AND REMANDED.

All justices concur except NEUMAN and TERNUS, JJ., who dissent, and SNELL, J., who takes no part.

NEUMAN, Justice (dissenting).

"There are some cases that in fairness are best resolved by a jury." With these words, the district court summed up the failed attempt to get Mary Hager to plead guilty to reduced charges at the pretrial conference held on Thursday preceding her Monday trial. Now convicted of terrorism and going armed with intent, Hager blames the court and her lawyer for preventing her from tendering a favorable—but belated—guilty plea on the morning of trial. It's an interesting tactic, but one we should not reward. I therefore respectfully dissent.

My quarrel with the majority's reasoning is two-fold. First it utterly disregards the State's principal argument supporting the district court's decision—that there was, in fact, no plea agreement reached on the morning of trial. Even assuming *arguendo* the court had a fixed and unwavering policy that permitted no accommodation for "good cause," no reversal based on abuse of discretion would be warranted. It is evident from the record that defense

---

5. We recognize the decision by the trial court to refuse the plea bargain was based on a plea agreement that was never memorialized, and an issue may arise on remand as to the terms or existence of the agreement. Notwithstanding, the record is clear that the State was not opposed to resolving the case by a plea agreement on the morning of trial. Thus, even if

the parties never formalized the plea bargain before presenting it to the trial court on the morning of trial, Hager suffered prejudice because the trial court decision denied her the opportunity to finalize the plea agreement with the State. If the parties are unable to reach a plea agreement on remand, the district court shall schedule the case for trial.

counsel was still cajoling Hager—unsuccessfully—on the morning of trial. No agreement was reduced to writing. Although Hager rests her due process argument on the fact that rule 9 requires "the disclosure of the agreement in open court," the rule's requirement presupposes that an agreement has been reached. *See* Iowa R. Crim. P. 9(2). But beyond a vague reference to "reduced charges," nothing before us reveals a firm charging concession by the State or, more importantly, a willingness by Hager to tender a guilty plea.

Second, the majority has joined the distinctly *minority* view concerning modern court administration. Those courts that recognize the value of plea deadlines as part of sound trial management protect against arbitrary rejection of belated pleas by tempering deadlines with exceptions to permit relief from the rule for good cause. Those same courts recognize, however, that good cause implicates "more than a mere change of mind or a renegotiation by the parties." *State v. Jasper*, 17 P.3d 807, 814 (Colo. 2001). By rejecting that sound caveat here, the majority permits a defendant's indecision to trump not only trial court discretion but sound administrative policy as well.

Despite my misgivings about the factual and legal bases for the majority's decision, I am perhaps most puzzled by the prospect of what will happen on remand. What plea is there for the court to entertain? No doubt Hager, having once been convicted, will now be much more amenable to plea negotiations. But, despite the majority's protestations to the contrary, that sounds to me more like manipulation than justice.

TERNUS, J., joins this dissent.