**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Greg MOORE, Defendant–Appellant.**

No. 89–6581.

United States Court of Appeals,
Sixth Circuit.

Argued July 23, 1990.

Decided Oct. 26, 1990.

Rehearing Denied Nov. 27, 1990.

Joe B. Brown, U.S. Atty. (argued), Wendy Goggin, Asst. U.S. Atty., Nashville, Tenn., for plaintiff-appellee.

Vincent E. Wehby (argued), Nashville, Tenn., for defendant-appellant.

Before KEITH and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

KEITH, Circuit Judge.

Defendant Greg Moore ("Moore") appeals from the district court's December 8, 1989 judgment and commitment orders finding him guilty of knowingly receiving, through the United States mail, a video tape containing visual depictions of minors engaged in sexually explicit conduct. For the reasons stated below, we AFFIRM and REMAND.

## I.

### A.

On April 12, 1989, Moore was indicted by the Federal Grand Jury of the Middle District of Tennessee. In a single count, the indictment charged Moore with knowingly

receiving a video tape containing visual depictions of minors engaged in sexually explicit conduct, as defined by 18 U.S.C. § 2256.[1] The video tape was transported, through the United States mail, from the seller, who was located in Nashville, Tennessee, to Moore, the buyer who resided in Corryton, Tennessee, all in violation of 18 U.S.C. § 2252(a)(2).[2]

Moore filed a motion to dismiss on July 27, 1989, alleging entrapment, outrageous government conduct, lack of predisposition, and the inapplicability of § 2252 to a single act of ordering child pornography. After receiving the Government's response and conducting a hearing on August 28, 1989, the district court denied Moore's motion to dismiss on September 8, 1989.

On September 12, 1989, the trial date, the parties filed a plea agreement with the district court. The district court, however, did not accept the plea:

> THE COURT: I'm not going to accept this 11(E)(1)(C) [sic][3] on the day of trial. Today is the day appointed to dispose of the case. We are here, the venire is here, ready to select a jury. And it's a matter of either trying the case or otherwise, whatever your choice may be, to-

day is the date we are supposed to dispose of the case.

Joint Appendix at 129 (hereinafter "J.A."). The district court initiated the trial as originally scheduled and, on September 15, 1989, the jury returned a guilty verdict. Moore remained free on bond until he was sentenced, on December 8, 1989, to fifteen months of incarceration, followed by three years of supervised release.[4]

Moore filed a timely notice of appeal on December 21, 1989.

### B.

In early 1988, Moore, a married, twenty-nine year old bank employee, purchased a copy of *Adult Video News*, an adult publication which lists individuals and companies that sell sexually explicit video tapes. While reading *Adult Video News*, Moore saw an advertisement which had been placed by A & B Video Company ("A & B"), a privately owned, sexually explicit video store which had been cooperating with undercover officers of the Orange County, Florida Sheriff's Department. Moore subsequently requested and received A & B's catalog, which contained a

---

1. Section 2256 defines specific terms used in the Child Protection and Obscenity Enforcement Act of 1988:

 (1) "minor" means any person under the age of eighteen years;
 (2) "sexually explicit conduct" means actual or simulated—
 (A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
 (B) bestiality;
 (C) masturbation;
 (D) sadistic or masochistic; abuse; or
 (E) lascivious exhibition of the genitals or pubic area of any person;
 (3) "producing" means producing, directing, manufacturing, issuing, publishing, or advertising;
 (4) "organization" means a person other than an individual;
 (5) "visual depiction" includes undeveloped film and videotape . . .

 18 U.S.C. § 2256.

2. Section 2252 provides that:

 (a) Any person who . . .
 (2) knowingly receives, or distributes any visual depiction that has been transported or

 shipped in interstate or foreign commerce by any means including by computer or mailed or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if—
 (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
 (B) such visual depiction is of such conduct;
 shall be punished as provided in subsection (b) of this section.

 18 U.S.C. § 2252(a)(2).

3. Federal Rule of Criminal Procedure 11(e)(1)(C) provides, in pertinent part, that "upon the entering of a plea of guilty or nolo contendere to a charged offense, the attorney for the government will do any of the following: . . . (C) agree that a specific sentence is the appropriate disposition of the case." Fed.R.Crim.P. 11(e)(1)(C).

4. During supervised release, the district court instructed Moore to participate in a mental health program approved by the Probation Office and to pay for the cost of his supervised release at the rate of $1,100 per year.

two-line advertisement placed by the undercover officers: "Looking for bizarre videos and photos, taboo material, want young girls, family or incest videos. Will trade for like material. Write Bryant, P.O. Box 617379, Orlando, Florida 32861, or call 407–427–2407." J.A. at 44.

Responding to the advertisement, Moore mailed an index card addressed to A & B, postmarked July 20, 1988, which said: "Bryant, please send me information on the following [sic], horse, dogs, children and fists." J.A. at 45. After mailing the card, Moore realized that he had sent it to the wrong address. He telephoned "Bryant" and "Carl," but remained unaware that they were undercover officers.[5] On July 28, 1988, Moore sent a second letter to the officers to clarify his interests. Moore wrote that he was interested in purchasing video tapes containing: pre-teen to fifteen year-old girls making love with men either vaginally, anally or orally; pre-teen to fifteen year-old girls with adult women; lesbian scenes; and various other pornographic depictions. Moore wrote in the margin of his letter "Please destroy" and added "have still nude and action photos of seventeen year old and adult male, Polaroid ..." J.A. at 46.

During the next six months, Moore continued to call the telephone number listed in the advertisement to speak with Bryant or Carl. On August 20, 1988, Moore mailed a package to Bryant which contained a roll of undeveloped film. Carl developed the film and found that it depicted a seventeen year-old female engaged in explicit sexual acts with an adult male. Carl then made photocopies of the sexually explicit photographs and sent the negatives and photographs back to Moore. Even though Moore told Carl that the photographs depicted a minor female, Carl had no independent evidence of the female's age and determined there was insufficient evidence to prosecute.

Because the Orange County undercover operation was a local operation, Carl notified Postal Inspector Perry LePere ("Inspector LePere") in Nashville, Tennessee of his contacts with Moore. Inspector LePere advised Carl that the Postal Inspection Service and the Federal Bureau of Investigation ("FBI") had established a joint federal undercover operation to investigate child pornography in Nashville. Inspector LePere continued that he would be working with FBI agent Brad Garrett ("Agent Garrett") in the joint operation.[6]

In September 1988, Moore telephoned Carl. Carl informed Moore that he could no longer deal with him, but that he had a source in Nashville who might meet Moore's needs. On January 25, 1989, Carl telephone Moore and gave him the number of the federal undercover operation, which Carl described as the "Nashville source." Carl instructed Moore to ask for "Tom."[7]

On January 26, 1989, Moore telephoned Tom and explained that he had been referred by Carl and wanted to purchase some videos. When Tom asked what Moore was looking for in particular, Moore replied "Ah, young women. Ah, teen, preteen type stuff." Moore stated that he was looking for the below fifteen years-old age group. He also requested action shots with women and young girls. Moore then asked Tom to develop 35 mm color action shots of twelve and thirteen year-old girls that he had photographed in the "project areas" of town.

In a January 26, 1989 letter, Tom mailed three documents to Moore: (1) a description of the film known as YL–62; (2) a description of the film known as YL–107; and (3) a preprinted form describing film processing costs. Film YL–62 was a bestiality tape with a horse and a woman priced at $65; and Film YL–107 was a tape containing six scenarios of child pornography priced at $275. In his letter, Tom explained that upon receiving Moore's or-

---

5. "Bryant" and "Carl" were the undercover names used by Bryant Rose and Carl Schwenk, both deputy sheriffs employed by the Orange County, Florida Sheriff's Department.

6. "Jason" was the undercover name used by Agent Garrett.

7. "Tom" was the undercover name used by Inspector LePere.

der form and payment, he would send the videos to Moore by registered mail.

On February 15, 1989, Moore mailed a copy of the Film YL–62 (the bestiaity tape) description, an order form and a personal check for $65 to Tom. Film YL–62 was then mailed to Moore. On March 10, 1989, Moore mailed "Young Services" [8] the Film YL–107 (the child pornography tape) order sheet, dated and signed "Greg Moore," as well as his payment totaling $275.[9]

On March 15, 1989, Film YL–107 was prepared by Inspector LePere for controlled delivery to Moore. Inspector LePere packaged the tape in an Express Mail envelope; addressed the envelope to Moore; affixed the proper postage; drove to Corryton, Tennessee and hand delivered the envelope to the Corryton postmaster. The Corryton postmaster then placed a note in Moore's Post Office Box that a piece of mail had arrived that was too large to fit in the box. After Moore picked up the package from the Post Office, he was arrested by Inspector LePere. Following his arrest, Moore consented to a search of his residence, which revealed a substantial library of adult pornographic magazines and video tapes, but no child pornography.

## II.

When reviewing the sufficiency of the evidence supporting a criminal conviction, "we must reverse only if the evidence is such that a reasonable mind could not find guilt beyond a reasonable doubt." *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). The evidence must be viewed in the light most favorable to the Government. *United States v. Johnson*, 855 F.2d 299, 303 (6th Cir.1988).

## A.

On appeal, Moore argues the district court abused its discretion by reject-

ing his guilty plea without " 'articulat[ing] a sound reason for rejecting the plea.' " Brief on Behalf of Defendant–Appellant at 48, *United States v. Moore* (6th Cir.1990) (No. 89–6581) (quoting *United States v. Delegal*, 678 F.2d 47, 50 (7th Cir.1982)). The Government counters that the district court "has broad discretion in deciding whether to accept a guilty plea and is under no duty to accept a negotiated plea agreement and need not state any reasons for rejecting a plea." Brief on Behalf of Plaintiff–Appellee at 34, *United States v. Moore* (6th Cir.1990) (No. 89–6581) (citing *United States v. Moore*, 637 F.2d 1194, 1196 (8th Cir.1981)).

The Government is correct in stating that the district courts have broad discretion in deciding whether or not to accept a plea agreement. *See Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (citing *Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211 (1962)). *See also United States v. Yates*, 698 F.2d 828, 829–30 (6th Cir.1983). We do not agree, however, with the Government that the district court "need not state any reasons for rejecting a plea." Brief on Behalf of Plaintiff–Appellee at 34. Although that rule was adopted by the Eighth Circuit in *United States v. Moore*, 637 F.2d 1194, 1196 (8th Cir.1981) (stating that a "district court is under no duty to consider a negotiated plea agreement [and that] Rule 11 does not require district courts to either accept a guilty plea or delineate its [sic] reasons for rejecting it") (citations omitted), we believe that the Seventh Circuit expressed the better view in *United States v. Delegal*, 678 F.2d 47 (7th Cir.1982). In *Delegal*, the court held:

> While a defendant has no absolute right to have a guilty plea accepted, a court must exercise sound discretion in determining whether or not to reject a plea. Thus, a defendant is entitled to plead guilty unless the district court can artic-

---

8. "Young Services" was the undercover named used by the Nashville-based, federal undercover operation to investigate child pornography.

9. Moore stipulated that Film YL–107, which is the subject of his indictment for violation of 18

U.S.C. § 2252(a)(2), visually depicts minors engaged in sexually explicit conduct as those terms are defined in 18 U.S.C. § 2256. Moore also stipulated that Film YL–107 was the video tape that he ordered.

ulate a sound reason for rejecting the plea.

*Id.* at 50 (citations omitted). *See also United States v. Ammidown,* 497 F.2d 615, 622 (D.C.Cir.1973) (requiring a "reasoned exercise of discretion in order to justify a departure from the course agreed on by the prosecution and defense"). *Cf. United States v. Miller,* 722 F.2d 562, 566 (9th Cir.1983) (holding that district courts "must set forth, on the record, both the prosecutor's reasons for framing the [charge] bargain as he did and the court's justification for rejecting the bargain") (citations omitted).

By leaving the decision whether to accept or reject a plea to the "exercise of sound judicial discretion," *Santobello,* 404 U.S. at 262, 92 S.Ct. at 498, the Supreme Court did not intend to allow district courts to reject pleas on an arbitrary basis. The authority to exercise judicial discretion implies the responsibility to consider all relevant factors and rationally construct a decision. *See United States v. Severino,* 800 F.2d 42, 46 (2nd Cir.1986) (holding that a court may reject a plea "if [it] has reasonable grounds for believing that acceptance of the plea would be contrary to the sound administration of justice"), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).[10] As the Seventh Circuit has recognized, requiring district courts to articulate a sound reason for rejecting a plea is the surest way to foster the sound exercise of judicial discretion. *See Delegal,* 678 F.2d at 50. Accordingly, we remand this case to the district court so that the district judge can articulate his reasons for rejecting Moore's guilty plea.[11]

### B.

▆▆ Moore next argues that the conduct of the Government constituted entrapment. In response, the Government argues that the evidence shows that Moore was predisposed to engage in the charged criminal activity prior to his initial exposure to Government agents. We agree.

In considering a defendant's entrapment defense, we must determine "whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the Government merely provided an opportunity to commit a crime to one who is already predisposed to do so." *United States v. Pennell,* 737 F.2d 521, 534 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). When the uncontradicted evidence shows lack of predisposition, entrapment can be determined as a matter of law. *See United States v. Silva,* 846 F.2d 352, 354–55 (6th Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 354 (1988). "However, once the issue of predisposition is in dispute, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense." *United States v. Johnson,* 855 F.2d 299, 303 (6th Cir.1988).

---

**10.** The Sentencing Guidelines imply that a judge's exercise of discretion in accepting a plea agreement will, at the very least, require preliminary consideration of all evidence relevant to sentencing:

> The court shall defer its decision to accept or reject any nonbinding recommendation pursuant to Rule 11(e)(1)(B), and the court's decision to accept or reject any plea agreement pursuant to Rules 11(e)(1)(A) and 11(e)(1)(C) until there has been an opportunity to consider the presentence report, unless a report is not required under § 6A1.1

Sentencing Guidelines § 6B1.1(c) (policy statement).

**11.** At oral argument, Government counsel suggested that this plea was offered after a plea deadline date set by the district court. Defense counsel denied that there was a plea deadline date, and the record before us does not resolve this dispute. The docket sheet makes no reference to a plea cut-off date, although there is a reference to a standing discovery order.

Our remand on this issue is not intended to mean that rejecting a plea because it comes too late may not be a proper exercise of discretion. The problem here is that we are simply unable to ascertain from the trial judge's brief comments the precise reason why this plea was rejected. If a trial judge sets a plea cut-off date and a plea is not offered prior to that time, the trial judge may well be justified in rejecting the plea. On the other hand, if the Government makes its first plea offer to a defendant the morning of trial and defendant accepts, the rejection of the plea under those circumstances may well constitute an abuse of discretion.

To determine Moore's state of mind prior to his initial exposure to Government agents, we consider the following factors:

> [T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducements or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. McLernon*, 746 F.2d 1098, 1112 (6th Cir.1984) (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983)).

In the case at bar, the record shows that Moore was predisposed to order and receive child pornography prior to his initial contact with Bryant, Carl and Tom ("the undercover officers"). Before contacting the undercover officers, Moore maintained a substantial collection of hard core pornographic materials and engaged in related criminal activity involving minors. Moore confessed to the undercover officers that he traveled to the "project areas" of town to solicit and photograph minors engaged in sexually explicit conduct. He later requested that the undercover officers develop his film negatives depicting a minor female engaged in sexual activity with an adult male.

On several occasions, Moore told the undercover officers that he was afraid of being prosecuted for receiving child pornography through the mail or being caught with child pornography in his home. Given Moore's knowledge that the charged criminal activity was illegal, the record does not support the claim that the undercover officers implanted the desire for child pornography in Moore's mind.

 Contrary to Moore's arguments, the initial suggestion of criminal activity was not made by the undercover officers. In fact, Moore initiated the contacts with Bryant by responding to his advertisement for those wanting to trade in video tapes featuring the "bizarre" or "taboo"—two code words for child pornography. In 1988, Moore made over fifteen telephone calls to the undercover officers; sent them a post card requesting information on "horses, dogs, children and fists;" and later mailed them a letter specifically asking for videos involving "pre-teen stuff ... anywhere below fifteen years-old." The record of Moore's initiation of contact with the undercover officers and his expressed desire for child pornography clearly rebuts his claims of entrapment.[12]

---

12. On appeal, Moore contends that the evidence was insufficient to convict him. In considering his argument, we must sustain the jury's determination if it is supported by competent and substantial evidence. *See United States v. Tilton*, 714 F.2d 642, 645 (6th Cir.1983). We find that the evidence of record was sufficient to support Moore's conviction for knowingly receiving a video tape depicting minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). First, Moore's decision *to initiate* written correspondence and telephone contact with the undercover officers rebuts his claims of entrapment. Second, Moore stipulated to ordering and receiving the illicit video tape. Given these factors, rational jurors correctly concluded that every element of Moore's offense was established beyond a reasonable doubt.

Moore next asserts that he did not violate 18 U.S.C. § 2252(a)(2) because the statute requires a "mailing" and he did not receive the illicit video tape through the mail. Moore correctly maintains that he received the video tape through a controlled delivery orchestrated by the undercover officers. The package he received, however, had the proper postage on it; was addressed and sealed; was received by him in an official post office; and thus, under the statute, constituted mail. *Cf. United States v. Fisher*, 464 F.2d 581, 582 (9th Cir.1972) (affirming, under 18 U.S.C. § 1708, the conviction of a postal employee for "mail" theft, even though the stolen item was a test package prepared by postal inspectors); *United States v. Collins*, 349 F.2d 863, 866 (2nd Cir.1965) (holding, under 18 U.S.C. § 1708, that "[g]enuine mail temporarily withdrawn from its usual course and treated by government agents for the same purpose is also none the less mail"), *cert. denied*, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966). Thus, we conclude that the child pornography received by Moore was mailed within the meaning of 18 U.S.C. § 2252(a)(2). *See United States v. Nelson*, 847 F.2d 285, 288 (6th Cir.1988) (affirming defendant's conviction under 18 U.S.C. § 2252(a)(2) on the grounds that defendant accepted controlled delivery of child pornography); *United States v. Duncan*, 896 F.2d 271, 278 (7th Cir.1990) (same).

■ Moore further claims that even if he was predisposed to purchase child pornography, he was, nevertheless, not predisposed to violate 18 U.S.C. § 2252 because he was firmly opposed to receiving such material through the mail. The transcripts of Moore's conversation with Inspector LePere display Moore's unmistakable hesitancy to receive child pornography via registered mail. On several occasions, Moore specifically requested that the contraband tape be sent via a private parcel carrier in order to reduce the chances that he would be convicted of a federal crime.[13]

If Section 2252 reached only child pornography sent through the mail, we would be more inclined to accept Moore's argument. The statute, however, encompasses not only receipt of child pornography through the mail, but also receipt of such material "that has been transported or shipped in interstate or foreign commerce by any means...." 18 U.S.C. § 2252(a). When Moore expressed discomfort with the plan to send the tape by mail, Inspector LePere offered to ship it via UPS but notified Moore that the package would be sent across state lines: from Fort Campbell, Kentucky, where the material was kept, to Corryton, Tennessee. J.A. at 341. Moore readily agreed to this arrangement, which would have constituted as sure a violation of Section 2252 as did the use of the mail.

On these facts, we agree with the district court that a reasonable mind could find, beyond a reasonable doubt, that Moore was predisposed not only to purchase child pornography, but also to receive it through the channels of interstate commerce or the mail in violation of 18 U.S.C. § 2252(a).

## C.

■ Moore also argues that his conviction is offensive to the due process clause of the fifth amendment. Moore contends that he was denied due process of law because the undercover officers employed

---

Moore also contends that 18 U.S.C. § 2252(a)(2) is not applicable to his *single* act of receiving child pornography. Section 2252 was enacted to reach both those who "traffic" in child pornography *and* all those who participate, *in any way*, in the sexual abuse of children through pornography. Section 2252 authorizes prosecution of those persons who knowingly receive "any visual depiction" of minors engaged in sexually explicit conduct. *See* 18 U.S.C. § 2252(a)(2). "Any" has been defined as "One or some, regardless of sort, quantity, or number ..." *Webster's II New Riverside University Dictionary*, 115 (1984). Thus, Moore need only have ordered and received *one* video tape depicting child pornography to be charged and convicted of violating 18 U.S.C. § 2252(a)(2).

Moore continues that the district court erred by issuing the following instruction to the jury: "The defendant's profit in the criminal activity need not be financial but merely that he was profiting from the expansion of his library of pornography." The district court is entitled to substantial latitude in tailoring jury instructions; thus, Moore's challenge must be reviewed only for abuse of discretion. *See United States v. Busacca,* 863 F.2d 433, 435 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1640, 104 L.Ed.2d 156 (1989). At trial, Moore argued that no child pornography was found in his home after the arrest. The district court, however, reviewed the record and correctly found, based on Moore's recorded telephone conversations and correspondence, that: (1) Moore did possess a home library of hard core pornography; and (2) Moore did disclose to the undercover officers that he had possessed photographs of minors engaged in sexually explicit conduct, prior to ordering Film YL–107. In violating § 2252, Moore reasonably may have been motivated to "expand" the child pornography portion of "his library of pornography." Thus, the jury instruction provided by the district court was accurate and clearly reflected the law.

13. *See* J.A. at 293, 313–17, 328–30, 334, 545–51, 656. A conversation between Garrett and Moore on February 9, 1989 is illustrative of Moore's reluctance. After preliminary conversations, Garrett mentioned Moore's "concerns about the mail." J.A. at 328. Garrett *explained* that "there is a way that we could send it to you UPS if you would rather." Moore responded "I really rather would." J.A. at 329. Moore explained:

> And I'll tell you why, 'cause I know even the possession of the stuff is probably against the law. But number two, if you send that, you can probably get out of that, if you, you know, it'd be hard to prosecute in your hometown and everything like that.... You can sort of home cook out of that. But when the Fed— when the mail people get ahold of you, you can't shake them guys.

J.A. at 329. Moore then stated that he did not know whether it was "just as illegal to sent it by UPS." J.A. at 330. Garrett responded: "I'm going to, I'm going to leave that up to you.... [W]hich are you more comfortable with?" J.A. at 330. Moore responded: "I'm more comfortable with UPS." J.A. at 334.

fundamentally unfair law enforcement tactics that amounted to outrageous Government conduct. In response, the Government argues that considering the nature of Moore's crime, the Government's conduct was not so outrageous as to violate the due process clause of the fifth amendment. We agree.

It has long been held that a law enforcement officer's conduct might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). In determining whether police conduct has undermined constitutional due process protections, four factors are considered:

> (1) the need for the type of government conduct in relationship to the criminal activity; (2) the preexistence of a criminal enterprise; (3) the level of the direction or control of the criminal enterprise by the government; (4) the impact of the government activity to create the commission of the criminal activity.

*United States v. Johnson,* 855 F.2d 299, 305 (6th Cir.1988) (citations omitted).

We have reviewed the record below and find that there was no violation of Moore's due process rights. Because those who sell, purchase and traffic in child pornography operate in secret, it was necessary for the undercover officers to purchase an advertisement in *Adult Video News* to detect and investigate violations of Section 2252. *See id.* at 304 (holding that postal inspector's placement of an advertisement in *Screw Magazine* was justified to detect and investigate violations of Section 2252). Our review of the record indicates that prior to contacting the undercover officers, Moore maintained a hard core pornography library, including photographs of minors engaged in sexually explicit conduct. Moreover, there is no evidence indicating that the undercover officers exercised any control over Moore's criminal activities, or that the officers increased the risk of Moore receiving child pornography through the mails. Moore originally responded to the undercover officer's advertisement for "bizarre" or "taboo" videos. Then, by telephone and written correspondence, Moore repeatedly expressed to the undercover officers his desire for "pre-teen stuff." Moore finally mailed a $275 signed check and ordered Film YL–107 from the undercover officers, with the full knowledge that: (1) Film YL–107 contained six scenarios of child pornography; and (2) Film YL–107 would be mailed to him. Under these facts, the undercover officers' conduct could not be deemed so fundamentally unfair and outrageous as to violate Moore's due process rights. *See id.; United States v. Thoma,* 726 F.2d 1191, 1199 (7th Cir. 1984), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

### III.

Government undercover operations are severely needed to prevent and deter those who produce, sell, purchase or traffic in child pornography. Child pornographers commit serious crimes which can have devastating effects upon society and, most importantly, upon children who are sexually abused. *See, e.g.,* E. Bass & L. Davis, *The Courage to Heal: A Guide for Women Survivors of Child Sexual Abuse* (1988); M. Lew, *Victims No Longer: Men Recovering from Incest & Other Sexual Child Abuse* (1988). In recommending the passage of the Child Sexual Abuse Act of 1986, the House Committee on the Judiciary explained: "Of all of the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purpose of producing child pornography." H.Rep. No. 99–910, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5952, 5953. The Government maintains an extremely important interest in preventing the spread of child pornography and child sexual abuse. Under 18 U.S.C. § 2252, Congress has provided a rational means to achieve this Government interest. Government undercover operations, such as the "Young Services" operation which led to Moore's arrest, are certainly required if our society is ever to be free of child por-

nography and the heinous crime of child sexual abuse.

Accordingly, we hereby AFFIRM the district court's December 8, 1989 judgment and commitment orders and REMAND this case so that the district judge can articulate his reasons for rejecting Moore's guilty plea.

BAILEY BROWN, Senior Circuit Judge, dissenting only to II–A of opinion.

I dissent as to the "remand ... to the district court so that the district judge can articulate his reasons for rejecting Moore's guilty plea."

Even if we accept the view that a district judge, in refusing to accept a plea agreement tendered under Rule 11(e)(1)(C) must "articulate the reasons," it appears to me that the judge did so. As set out in this court's opinion, the judge articulates that he refuses to accept the plea with an agreed disposition because the parties had delayed until the day of the trial, with prospective jurors present and time set aside to try the case, to tender this guilty plea with an agreed sentence to be considered by the court.

It may be that the majority opinion really means that the reason as articulated was not sufficient and that the remand is to articulate another reason. However, since, as is stated in the majority opinion, the test to be applied here is whether the district judge abused his discretion, I believe the reason articulated supports a determination that he did not abuse his discretion.

I, therefore, dissent from the order of remand.