RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ALEJANDRO COTA-LUNA (17-3692); ANTONIO NAVARRO-GAYTAN (17-3694),

*Defendants-Appellants*.

Nos. 17-3692/3694

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:16-cr-00307—John R. Adams, District Judge.

Argued: May 2, 2018

Decided and Filed: June 4, 2018

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jaime P. Serrat, JAIME P. SERRAT LLC, Cleveland, Ohio, for Appellant in 17-3692. Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant in 17-3694. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jaime P. Serrat, Marisa L. Serrat, JAIME P. SERRAT LLC, Cleveland, Ohio, for Appellant in 17-3692. Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant in 17-3694. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court in which MOORE, J., joined, and KETHLEDGE, J., joined in the result. KETHLEDGE, J. (pp. 16–17), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendants Alejandro Cota-Luna and Antonio Navarro-Gaytan appeal their convictions and sentences for conspiracy to possess with intent to distribute at least 92 kilograms of a mixture or substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846.   For the reasons set forth below, we **VACATE** Defendants' convictions and sentences and **REMAND** their cases with instructions for the district court to reconsider whether to accept the plea agreements the parties offered under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.   We further order that the cases be reassigned on remand to a different district court judge.

**FACTUAL AND PROCEDURAL HISTORY**

In early September 2016, an agent of the Drug Enforcement Agency in Ohio learned from colleagues in California that a particular tractor trailer traveling to Cleveland, Ohio, likely contained narcotics.   When the truck arrived in Cleveland the next morning, investigators were waiting.   They watched as the driver parked in a fenced-in lot behind a large commercial building.   Thirty minutes later, a small Nissan sedan driven by Defendants Cota-Luna and Navarro-Gaytan entered the parking lot, stopping near the truck.   The drivers of the two vehicles talked; when they finished, they maneuvered their vehicles to a secluded area of the lot.   The driver of the truck unhitched the trailer and drove away in the cab.   Investigators did not follow him, and he was never identified.

After the truck driver left, Cota-Luna and Navarro-Gaytan approached the trailer.   Using flashlights, they appeared to work on a secret compartment underneath the trailer.   At various points, they walked back and forth between the trailer and sedan, apparently moving items between the vehicles.   After around thirty minutes, they drove away in the sedan, leaving the trailer unattended.

A short while later, Ohio State Troopers stopped Defendants' vehicle, allegedly for speeding.   During the stop, a narcotics detection dog sniffed the car and alerted the officers to the

possible presence of narcotics. The officers searched the car but did not find any drugs, money, or illegal items. Instead, they found tools—including screwdrivers, pry bars, and a headlamp—as well as a notebook filled with writing in Spanish. The officers photographed some of the items, including the notebook, but allowed Cota-Luna and Navarro-Gaytan to leave with a warning for speeding.

After Cota-Luna and Navarro-Gaytan were released, law enforcement officers obtained a search warrant for the secret compartment underneath the trailer, which remained unattended in the parking lot. When executing the warrant, officers discovered that the trailer actually had two secret compartments, containing around 92 kilograms of cocaine. Cota-Luna and Navarro-Gaytan were arrested in a hotel, and officers seized three cell phones and the Spanish notebook. One cell phone contained coded text messages to and from different phone numbers. The notebook was translated and contained the decoded messages: detailed information regarding when and where the tractor trailer would arrive in Cleveland and instructions to contact certain phone numbers once Cota-Luna and Navarro-Gaytan located the trailer.

In late September 2016, Cota-Luna and Navarro-Gaytan were charged with two crimes: (1) conspiracy to possess with intent to distribute at least 92 kilograms of a mixture or substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; and (2) possession with intent to distribute at least 92 kilograms of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2. The mandatory minimum sentence for each offense was 10 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(A).

The parties began plea negotiations and quickly agreed that Defendants played only a small role in the drug conspiracy. In particular, the parties agreed that Defendants, who lived in Mexico, were unaware of the nature and amount of drugs contained in the trailer; relied entirely on directions sent to Cota-Luna by cell phone; did not organize or plan the criminal activity; and were unable to open the secret compartments under the trailer because they lacked the proper tools. The parties further agreed that Defendants participated in the crime due to threats from the Mexican drug cartel that recruited them. According to the government, there was no reason to think that either Defendant stood to profit in any way from the criminal transaction. In addition, both Defendants had accepted responsibility for their actions, cooperated fully with the

government, and expressed remorse. In short, the parties saw Defendants as pawns in a dangerous game run by a large, powerful Mexican drug cartel. As the government would later explain, international drug traffickers often use "highly segmented and compartmentalized stages during shipment." (R. 74, government sentencing memorandum, PageID# 679.) This ensures that "no single actor is fully aware of the scope of the whole conspiracy, thus if they are caught, there is little useable [sic] information provided to law enforcement." (*Id.*)

Defendants agreed to plead guilty to the conspiracy count under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. That rule authorizes plea agreements that, if accepted by the district court, specify the exact sentence the district court must enter. *See* Fed. R. Crim. P. 11(c)(1)(C). In calculating Defendants' offense levels under the United States Sentencing Guidelines, the plea agreements began with a base offense level of 34. *See* U.S.S.G. § 2D1.1(c)(3) (base offense level of 34 applies if the crime involved at least 50 but less than 150 kilograms of cocaine). The plea agreements then applied the "Safety Valve" guideline, § 5C1.2, which authorizes a sentence below the mandatory minimum for certain defendants with little or no criminal history. *See* U.S.S.G. § 5C1.2. This triggered a two-point offense-level reduction under an associated guideline, § 2D1.1(b)(17). *See* § 2D1.1(b)(17) (applying a two-point offense-level reduction if the Safety Valve guideline was applied). Next, the plea agreements provided for a four-point offense-level reduction under guideline § 3B1.2(a) for being "minimal participants" in the drug conspiracy; a three-point offense-level reduction under guideline § 2D1.1(a)(5)(ii) for being minimal participants in a crime involving a large amount of drugs; a two-point offense-level reduction under guideline § 2D1.1(b)(16) for being minimal participants who, *inter alia*, acted out of fear; and a three-point offense-level reduction under guideline § 3E1.1 for acceptance of responsibility. This resulted in a final offense level of 20 for each Defendant. In light of this offense level and the circumstances of the case, the plea agreements specified that Cota-Luna should be sentenced to exactly 36 months' imprisonment and that Navarro-Gaytan should be sentenced to exactly 33 months' imprisonment.[1]

---

[1]The plea agreements did not contain any agreement about Defendants' criminal history categories and therefore did not identify their guideline ranges.

In January 2017, the parties attended a change of plea hearing, expecting to enter the plea agreements. To their surprise, the district court rejected the agreements. When the government asked for an explanation, the district court refused to answer, saying "I don't think it's appropriate" to discuss the matter. (R. 104, plea hearing transcript, PageID# 935.) But the parties persisted, asking whether the court objected to the guidelines calculations in the plea agreements. The district court responded:

> Guidelines are advisory. They are just the starting point. I've got to consider the—I have to consider the nature and circumstances of the offense, all the overall conduct. We have, what, 90 plus kilograms of cocaine? I have other relevant conduct that's going to be part and parcel of the case.
>
> So the guideline computation may be accurate or may not, but my hands are not going to be tied when I look at all the various factors that I am required to consider.

(*Id.* at 936.) The district court did not further explain why it found the plea agreements objectionable, but it made clear that it would not accept any sort of "C agreement." (*Id.*)

After the plea hearing, the parties continued negotiating. Three days later, at a second plea hearing, the parties presented the district court with a revised plea agreement for each Defendant. The revised plea agreements were made pursuant to Rule 11(c)(1)(B) and therefore preserved the district court's sentencing discretion. *See* Fed. R. Crim. P. 11(c)(1)(B) (authorizing plea agreements that "do[] not bind the court"). Otherwise, however, the revised plea agreements were nearly identical to the plea agreements the district court had already rejected. In particular, they contained the same guidelines calculations found in the original plea agreements.

This time, the district court accepted the plea agreements. In doing so, the district court established a factual basis for Defendants' pleas and confirmed that Defendants were pleading guilty voluntarily and intelligently. In addition, the district court informed each Defendant that the agreed-upon guidelines calculations were merely advisory.

A Presentence Investigation Report ("PSR") was prepared for each Defendant, confirming that Defendants played a small role in the drug conspiracy. Each PSR explained that

based on written notes and text messages located in the defendant's rental car it is clear that these defendants were unaware of th[e] nature and amount of narcotics. They relied entirely on directions sent to them via cell phone. They were not part of the organization or planning of the criminal activity. Based on hotel records, they spent two days at the hotel waiting for further directions. Also, they were unable to open the compartment under the trailer because they did not possess the proper tools.

(Cota-Luna PSR at ¶ 31; Navarro-Gaytan PSR at ¶ 30.)   The PSRs' offense-level calculations mirrored those in the plea agreements, with one exception: the PSRs did not apply a two-point offense-level reduction under guideline § 2D1.1(b)(16) for being minimal participants who, *inter alia*, acted out of fear. The PSRs explained that the record did not contain any information about why Defendants had committed the offense.

In response to the PSRs' concerns about the § 2D1.1(b)(16) reduction, Defendants submitted sentencing memoranda explaining why they participated in the drug conspiracy. Cota-Luna's sentencing memorandum explained that he "only got involved under the threats and fear imposed on himself and his loved ones by Mexican drug traffickers" from Sinaloa, Mexico, "one of the most treacherous areas of the country." (R. 72, Cota-Luna sentencing memorandum, PageID# 583.)   Navarro-Gaytan's sentencing memorandum was similar, explaining that he "understood from his co-defendant Mr. Cota-Luna, that the narcotics transaction in Cleveland was orchestrated by powerful and dangerous people within the cartel and that Mr. Cota-Luna himself was too scared to refuse to participate." (R. 73, Navarro-Gaytan sentencing memorandum, PageID# 616.)   The government agreed in its sentencing memorandum that all the offense-level reductions identified in the plea agreements should apply.

At Defendants' sentencing hearings, the district court expressed reservations about the parties' guidelines calculations. Among other concerns, the district court stated that Defendants probably did not satisfy the Safety Valve requirements. The district court noted that the Safety Valve guideline applies only if the defendant "truthfully provided to the Government all information and evidence the defendant has concerning the offense" at some point "not later than the time of the sentencing hearing." U.S.S.G. § 5C1.2(a)(5). In the district court's view, this required an in-person meeting with government officers to discuss the offense. Defendants in

the instant cases had not personally met with government officers. Instead, they relied on their attorneys to convey their information to the government.

Given the district court's concerns about the Safety Valve guideline, the parties requested a short continuance of sentencing. The district court granted a continuance of about a month. During that time, both Defendants personally met with government officers to discuss their crime. After these proffer sessions, the government submitted a supplemental sentencing memorandum summarizing what Defendants told them. The sentencing memorandum confirmed what everyone already knew: that Defendants admitted their role in the crime but denied planning or organizing any aspect of the offense.

After the government filed its supplemental sentencing memorandum, the district court entered an order "to provide the Court's initial advisory Guideline calculation." (R. 80, presentencing order, PageID# 695.) In the order, the district court concluded that neither Defendant satisfied the Safety Valve requirements because neither Defendant had personally discussed the offense with government officers before commencement of the first sentencing hearing. The district court added that Cota-Luna was ineligible for Safety Valve relief for a second reason as well: according to the district court, Cota-Luna was an "organizer or leader" of the offense because he had "recruited and directed the activities of Gaytan-Navarro [sic]." (*Id.* at 701.) Next, the district court concluded that neither Defendant qualified for a minimal-participant reduction under guideline § 3B1.2(a). The district court reasoned that, as drug couriers, Defendants were "indispensable to the success" of the criminal conspiracy. (*Id.* at 700; *see also id.* at 702–03.) Finally, the district court concluded that Defendants were ineligible for a reduction under guideline § 2D1.1(b)(16) because that guideline applies only if the defendant received a minimal-participant reduction. Although not explicitly mentioned by the district court, Defendants' failure to qualify for a mitigating-role reduction also disqualified them for a reduction under guideline § 2D1.1(a)(5). *See* U.S.S.G. § 2D1.1(a)(5).

At Defendants' second sentencing hearings, the district court made rulings that aligned with the views expressed in its presentencing order, resulting in a guidelines range of 120 months' imprisonment (the mandatory minimum sentence) to 135 months' imprisonment for each Defendant. Specifically, the district court granted each Defendant a three-level reduction

for acceptance of responsibility but denied Safety Valve relief under guideline § 5C1.2, denied the associated offense-level reduction under guideline § 2D1.1(b)(17), denied a minimal-participant reduction under guideline § 3B1.2(a), and denied reductions under guideline § 2D1.1(b)(16) and (a)(5). In denying Safety Valve relief for Navarro-Gaytan, the district court made a finding not mentioned in its presentencing order: that Navarro-Gaytan lied at his proffer when he said he did not initially realize the tractor trailer contained narcotics. According to the district court, the circumstances of the case and the admissions in Navarro-Gaytan's plea agreement suggested that he knew all along about the drugs.

Because the district court denied Safety Valve relief, each Defendant was subject to a mandatory minimum sentence of 10 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(A). The district court imposed a 10-year sentence on each Defendant, finding the sentences severe but appropriate. In explaining why a 10-year sentence was warranted, the district court focused on the nature of the offense, the need for deterrence, the characteristics of the Defendants, and other factors. Near the end of Cota-Luna's sentencing, Cota-Luna's counsel asked the government if it stood by the guidelines calculations contained in Cota-Luna's plea agreement, even though those calculations had been rejected by the district court. Counsel for the government responded that the government did indeed stand by the parties' guidelines calculations. Both Defendants timely appealed.[2]

In their briefs, Defendants raise numerous claims. First, Cota-Luna argues that the district court abused its discretion in denying his Rule 11(c)(1)(C) plea agreement. Had the district court accepted that agreement, it would have been required to sentence him to exactly 36 months' imprisonment. Next, both Defendants argue that the district court erred in denying Safety Valve relief under guideline § 5C1.2; erred in denying the associated reduction under guideline § 2D1.1(b)(17); erred in denying a minimal-participant reduction under guideline

---

[2]The plea agreements allowed Defendants to appeal "any sentence to the extent it exceeds the maximum of the sentencing imprisonment range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the [district] Court." (R. 61, Navarro-Gaytan plea agreement, PageID# 474–75; R. 62, Cota-Luna plea agreement, PageID# 488–89.) Because the district court ruled that both Defendants qualified for a Criminal History Rating of I—the lowest level—this means Defendants preserved the right to appeal any sentence exceeding 41 months' imprisonment. *See* U.S.S.G § 5A (Sentencing Table) (recommending 33–41 months' imprisonment at offense level 20, Criminal History Category I).

§ 3B1.2(a); and erred in denying reductions under guideline § 2D1.1(b)(16) and (a)(5). Finally, Navarro-Gaytan raises three additional claims: (1) that if an in-person interview was required for a Safety Valve reduction, counsel was ineffective for failing to present Navarro-Gaytan for an interview; (2) the district court abused its discretion by denying certain requests for continuances; and (3) Navarro-Gaytan's sentence is substantively unreasonable.

## DISCUSSION

We first address whether the district court provided sufficient reasons for rejecting Defendants' Rule 11(c)(1)(C) plea agreements. Because we find that the district court's reasons were insufficient, we vacate Defendants' convictions and sentences and remand their cases with instructions for the district court to again consider whether to accept Defendants' Rule 11(c)(1)(C) plea agreements. We also determine that, in light of the district court's conduct throughout these cases, the proceedings should be reassigned to a different district court judge on remand.

## I.      Defendants' Rule 11(c)(1)(C) Plea Agreements

### Standard of Review

While a defendant has "no absolute right to have a guilty plea accepted," a court must exercise "sound judicial discretion" in determining whether to reject a plea. *Santobello v. New York*, 404 U.S. 257, 262 (1971). "[R]equiring district courts to articulate a sound reason for rejecting a plea is the surest way to foster the sound exercise of judicial discretion." *United States v. Moore*, 916 F.2d 1131, 1136 (6th Cir. 1990). Consequently, "a defendant is entitled to plead guilty unless the district court can articulate a sound reason for rejecting the plea." *United States v. White*, 308 F. App'x 910, 915 (6th Cir. 2009) (quoting *Moore*, 916 F.2d at 1135–36 (6th Cir. 1990)).[3]

---

[3]Although Cota-Luna forcefully argues that the district court should have accepted his Rule 11(c)(1)(C) plea agreement, Navarro-Gaytan has not raised the issue in his brief. Nonetheless, because Defendants are similarly situated, we consider whether the district court should have accepted the plea agreements from both Defendants. *See United States v. Pugh*, 405 F.3d 390, 401–02 (6th Cir. 2005) ("[T]his Court has discretion to correct plain errors affecting important rights of criminal defendants, even when not raised on appeal." (quoting *United States v.*

**Analysis**

Very few cases address the type of inquiry that a district court should engage in when considering whether to accept a plea agreement. But one thing is clear: a district court must "rationally construct a decision" based on "all relevant factors." *Moore*, 916 F.2d at 1136. When considering whether to accept a Rule 11(c)(1)(C) plea agreement, a district court may "defer a decision until the court has reviewed the presentence report." Fed. R. Crim. P. 11(c)(3)(A). This is generally the preferred practice. *See* Advisory Committee's Notes on 1979 Amendments to Fed. R. Crim. P. 11 (explaining that under Rule 11(c)(3)(A), "[t]he judge may, *and often should*, defer his decision until he examines the presentence report" (emphasis supplied)).

In this case, the district court rejected Defendants' Rule 11(c)(1)(C) plea agreements before their PSRs were prepared. In addition, it initially refused to give any explanation for its decision, saying it would not be "appropriate" to do so. (R. 104, plea hearing transcript, PageID# 935.) But an explanation was more than "appropriate"—it was required. *See Moore*, 916 F.2d at 1136 (holding that a district court must "articulate a sound reason for rejecting a plea"). When pressed by the government, the district court ultimately expressed two concerns with Defendants' binding plea agreements. First, the district court stated that the sentences specified in the agreements might be too lenient given that Defendants were responsible for "90 plus kilograms of cocaine." (R. 104, plea hearing transcript, PageID# 936.) Second, the district court stated that it wanted to preserve its sentencing discretion to take into account unspecified "relevant conduct" that was "part and parcel of the case." (*Id.*) It did not further explain its decision.

These were not "sound reasons" for rejecting Defendants' plea agreements. To be sure, 92 kilograms is a substantial amount of cocaine. However, Defendants' Rule 11(c)(1)(C) plea agreements already took into account the amount of drugs involved, under guideline § 2D1.1(c)(3). That is why Defendants each received a base offense level of 34, the third highest level under the drug quantity table. *See* U.S.S.G. § 2D1.1(c)(3) (base offense level of 34 applies

---

*Graham*, 275 F.3d 490, 521 (6th Cir. 2001)); *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

if the crime involved at least 50 but less than 150 kilograms of cocaine). While a district court may consider a sentencing factor under 18 U.S.C. § 3553(a) even if that factor was already considered under the guidelines, *see United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010), that should have worked in Defendants' *favor* in this case. Indeed, there is no question that the amount of drugs overrepresented—not underrepresented—the seriousness of the offense. Defendants did not know the amount of drugs involved; they were unable to access the drugs; and the drugs were never sold. In addition, Defendants did not organize or plan the crime; they did not exercise decision-making authority over any aspect of the crime; and they did not stand to benefit from it. Consequently, the district court's concern about the amount of drugs involved was not a "sound reason" for rejecting the plea agreements.

For many of the same reasons, the district court's vague reference to other "relevant conduct" that was "part and parcel of the case" is likewise insufficient to support its rejection of the plea agreements. Again, Defendants' role in the offense was extremely minor. In addition, they participated in the crime only because they feared retribution from the Mexican drug cartel that recruited them. Taken together, this appears to be one of the rare cases in which *every single* "relevant conduct" consideration—aside from the amount of drugs involved—weighed in favor of a light sentence. Indeed, the government does not even argue that other "relevant conduct" supported the district court's rejection of the plea agreements. Instead, the government's brief focuses exclusively on the district court's concern about the amount of drugs involved. But as explained above, that concern was insufficient to support the district court's rejection of the plea agreements.

Accordingly, in these exceptional circumstances, the district court's rejection of Defendants' plea agreements was an abuse of discretion. It simply did not reach a "rational decision" based on "all relevant factors." *Moore*, 916 F.2d at 1136. We therefore remand these cases with instructions for the district court to again consider whether to accept Defendants' Rule 11(c)(1)(C) plea agreements.[4]

---

[4]The concurrence warns that we are "allow[ing] the parties to arrogate the district court's sentencing power simply by agreeing upon a particular sentence." In addition, the concurrence implies that we are deferring to the sentencing determinations made by the parties, rather than the sentencing determinations reached by the district

## II.      Reassignment on Remand

In his brief and again at oral argument, Navarro-Gaytan argued that his case should be reassigned on remand.  Although Cota-Luna did not raise the issue in his brief, we consider whether his case should be reassigned as well, inasmuch as Defendants are similarly situated.

### Legal Standard

"This Court possesses the power, under appropriate circumstances, to order the reassignment of a case on remand pursuant to 28 U.S.C. § 2106."  *Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014); *see also* 28 U.S.C. § 2106 ("The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.").  To determine whether reassignment is necessary, this Court considers:

(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings;

(2) whether reassignment is advisable to preserve the appearance of justice; and

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Rorrer*, 743 F.3d at 1049 (*quoting U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532–33 (6th Cir. 2012)). "Reassignment is an extraordinary power and should be rarely invoked." *Id*. (quoting *U.S. ex rel. Williams*, 696 F.3d at 532–33).

All three factors weigh in favor of reassignment.  First, the district judge's conduct throughout these cases suggests that he was predisposed to impose a harsh sentence on each Defendant.  To start, the district judge rejected Defendants' Rule 11(c)(1)(C) plea agreements before their PSRs were even prepared.  Then at sentencing, the district judge rejected, on dubious

---

court.  But we do neither of these things. We agree that a district court has discretion reject a plea agreement that specifies a particular sentence.  We also agree that the parties' sentencing determinations are not entitled to deference.  We simply hold, based on binding precedent, that "a defendant is entitled to plead guilty unless the district court can articulate a sound reason for rejecting the plea." *Moore*, 916 F.2d at 1135–36 (quoting *United States v. Delegal*, 678 F.2d 47, 50 (7th Cir. 1982)).  In the instant cases, the district court did not provide any "sound reasons" for rejecting Defendants' plea agreements.

grounds, nearly every guidelines reduction identified in Defendants' plea agreements.  For example, the district judge initially ruled that Defendants were ineligible for Safety Valve relief because they had not personally discussed their crimes with government officers prior to the first sentencing hearing.  But the Safety Valve guideline does not explicitly require an in-person meeting, *see* U.S.S.G. § 5C1.2, this Court has never suggested that such a requirement is implicit, and other Circuits have held that the Safety Valve guideline does not specify any particular form that a defendant's communication must take, *see United States v. Tate*, 630 F.3d 194, 200 (D.C. Cir. 2011); *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1092 n.7, 1093 (10th Cir. 2007); *United States v. Schreiber*, 191 F.3d 103, 108 (2d Cir. 1999); *United States v. Dukes*, 147 F.3d 1033, 1035–36 (8th Cir. 1998); *United States v. Montanez*, 82 F.3d 520, 522–23 (1st Cir. 1996).[5]  Next, the district judge refused to apply a minimal-participant reduction under the guidelines even though Defendants apparently satisfied every single minimal-participant factor.[6]  *See* U.S.S.G. § 3B1.2 App. Note 3(C) (listing relevant factors).  Remarkably, the district judge went to the other extreme; he determined that Cota-Luna was an "organizer or leader" of the criminal enterprise despite his extremely minor role in the offense.[7]  Later, the district judge repeatedly suggested that Navarro-Gaytan had experience drug trafficking, accusing him of having "expertise" using "secret compartments . . . in tractor trailer rigs" to transport drugs. (R. 88, sentencing transcript, PageID# 758.)  Yet there is no evidence in the record that Navarro-

---

[5]Tellingly, the government has consistently argued throughout these proceedings that an in-person meeting is *not* required for Safety Valve relief.

[6]Instead of applying the minimal-participant factors listed in Application Note 3(C), the district judge focused on Defendants' role in the conspiracy, finding them indispensable to the success of the criminal enterprise. Even accepting this questionable premise, a minimal-participant reduction would still have been warranted.  The guidelines commentary explicitly states that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  *See* U.S.S.G. § 3B1.2, Application Note 3(C).

[7]In concluding that Cota-Luna was an "organizer or leader," the district court found that "Cota-Luna both recruited and directed the activities of Gaytan-Navarro [sic]."  (R. 80, presentencing order, PageID# 701).  The record, however, does not support the finding that Cota-Luna directed Navarro-Gaytan's activities.  Rather, the record shows that Cota-Luna and Navarro-Gaytan flew together to Cleveland, received instructions to engage in the same activity, jointly purchased tools to open the truck, and helped each other to inspect the truck.  Cota-Luna paid for the airfare to Cleveland, but Navarro-Gaytan rented the car once they were here.  Thus, even if Cota-Luna recruited Navarro-Gaytan, Cota-Luna is better described as someone who "merely suggest[ed] committing the offense" and not as someone who "exerted some control over at least one individual within [the] criminal organization."  *United States v. Hopson*, 134 F. App'x 781, 795 (6th Cir. 2004) (quoting *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997)).  The former conduct does not warrant application of the "organizer, leader, manager, or supervisor" label, while the latter does.

Gaytan had any such experience. Taken together, this type of conduct indicates that the district judge had made up his mind that Defendants deserved a harsh sentence, without having received any evidence to that effect. This suggests that the district judge might have "substantial difficulty" putting these views aside on remand. *See Rorrer*, 743 F.3d at 1049.

Second, reassignment would be advisable to preserve the appearance of justice. We do not mean to suggest that the district court displayed personal animus toward the defendants. After all, when sentencing Cota-Luna and Navarro-Gaytan, the district court commended Cota-Luna's attorney for his zealous advocacy, offered to recommend that both Defendants be housed in their preferred correctional institutions, and offered to have the district court deputy work with the Bureau of Prisons to facilitate a visit from Navarro-Gaytan's terminally ill wife. Nevertheless, as described above, the district court appeared predisposed to imposing harsh sentences on both defendants, and the district court relied on legally erroneous interpretations of the guidelines, speculative musings about the cartel's motivations, and unsupported assertions about Defendants' knowledge and experience to reach that result. Reassignment therefore is warranted to maintain the integrity of our judicial system and to ensure that these cases are heard by a judge whose impartiality cannot reasonably be questioned. *See Lavin v. Husted*, 764 F.3d 646, 652 (6th Cir. 2014).

Third, reassignment would not result in a waste of judicial resources. There was no trial in this case. The record is not complex. *See Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 580 (6th Cir. 2013) (declining to reassign based, in part, on "the nature of [the] complex litigation with multiple experts and significant time spent in discovery"). On remand, the new district judge must simply read the Rule 11(c)(1)(C) plea agreements, the PSRs, and a few other documents. That is all. "Any lost efficiency is not out of proportion to the gain in preserving the appearance of fairness." *Rorrer*, 743 F.3d at 1050 (quoting *United States v. Gapinski*, 422 F. App'x 513, 522 (6th Cir. 2011)).

Accordingly, all three factors weigh in favor of reassignment. We therefore determine that reassignment is appropriate.

## CONCLUSION

For the foregoing reasons, we **VACATE** Defendants' convictions and sentences and **REMAND** their cases with instructions for the district court to again consider whether to accept Defendants' Rule 11(c)(1)(C) plea agreements.  We further order that these cases be reassigned on remand to a different district court judge.

---

**CONCURRENCE**

---

KETHLEDGE, Circuit Judge, concurring in the judgment.  The power to sentence a criminal defendant lies not with this court or the parties themselves, but with the district court. *See, e.g., Gall v. United States*, 552 U.S. 38, 51-53 (2007).  Our role is simply to review the district court's exercise of that power for an abuse of discretion.  And nothing in Criminal Rule 11 or elsewhere in the law allows the parties to arrogate the district court's sentencing power simply by agreeing upon a particular sentence.  Hence that agreement does not create some sort of presumption that the district court must then overcome.  That the parties agreed upon particular sentences here, therefore, does not mean that the district court was obligated to offer up reasons as to why those sentences were unreasonable.  Instead, that a district court thinks it *might* want to impose a different sentence than the one chosen by the parties—even, say, a sentence different by only a month—is reason enough for the court to reject a plea agreement under Rule 11(c)(1)(C).  *Accord United States v. Robertson*, 45 F.3d 1423, 1439 (10th Cir. 1995).  In short, the district court owes zero deference to the sentencing determinations of the parties; instead all the deference runs the other way.

Rule 11(c) confirms as much.  As an initial matter, contrary to the majority's suggestion, the Rule allows a district court freely to reject an 11(c)(1)(C) agreement before the court reviews the defendant's presentence report.  *See* Fed. R. Crim. P. 11(c)(3)(A).  True, the better practice in most cases might be to review the report first; but the Rule itself contains no such requirement.  But more to the point, the Rule itself tells us what "the [district] court must do" when "the court rejects" a Rule 11(c)(1)(C) agreement:  namely, the court must inform the parties of the rejection and advise the defendant of various things—which do not include an explanation as to *why* the court rejected the agreement.  *See* Fed. R. Crim. P. 11(c)(5).

All that said, a district court should not categorically refuse to consider Rule 11(c)(1)(C) agreements, since doing so would make that subsection of the Rule (which is itself law) a dead letter.  And though the court need not formally recite its reasons for rejecting such an agreement, the record as a whole must afford our court an adequate basis to determine whether the rejection

was an abuse of discretion.  *See, e.g., United States v. Howard*, 644 F.3d 455, 459 (6th Cir. 2011).  Such abuses remain possible:  if the record indicates that the district court rejected the agreement for an impermissible reason, for example, that could be an abuse of discretion.  *See Robertson*, 45 F.3d at 1438 (district court's rejection of a plea agreement based upon the court's own trial calendar was an abuse of discretion).

An impermissible reason is what I think supports vacatur of the district court's rejection of the plea agreement here.  Specifically, the record as a whole suggests that the court's rejection was based in part upon the court's belief (as the court explained in a later hearing) that the defendants did not qualify for safety-valve relief under U.S.S.G. § 5C1.2.  As the Majority explains, Maj. Op. at 12-13, that belief was legally mistaken.  And a decision based upon a legal mistake is an abuse of discretion.  *See United States v. Mandoka*, 869 F.3d 448, 452-53 (6th Cir. 2017).

For these reasons, I concur in the judgment only.